ADAMS, J., dissenting.
The material facts are:
W. D. Shaw, plaintiff's intestate, was employed by the defendant, the National Handle Company, and had the superintendency of its logging *Page 223 
business — "log foreman." He was in charge of logs in the woods, seeing the logs cut down and rafted. The raft was turned loose on Roanoke River to float down to Plymouth. A colored man in a canoe went along with the raft until it was met by the defendant company's boat. At the time of his death Shaw was in the employ of defendant, the National Handle Company, and had been for two years. Joe Dixon was superintendent under the defendant M. J. Norton, who was manager. Shaw frequently went to Plymouth and returned to his logging work on the Coast Line train, which leaves Plymouth about 7 o'clock a. m. On the Sunday before Shaw's death he started up the river in the company's boat with one Curby, an employee of the company, but did not go, as it was out of order and needed repairs. Joe Dixon, the superintendent, witness for plaintiff, testified, in part, that under the direction and orders of M. J. Norton, the manager, he saw Elmer Jackson, and a boat was obtained from Jackson, who said the boat was in perfect condition. Jackson would not let the boat go without his employee, a colored man, named John Parker, an engineer, to run it. The colored man and Shaw left in the Jackson boat between 10 and 11 o'clock on Sunday morning. The gas to run the boat, about 62 to 72 gallons, was drained out of the defendant's boat that was then out of repair.
"Q. Did you know for what purpose he was going? A. For convenience, to get to his raft — that is all I know. He had no business in the boat, so far as I know. That was the National Handle Company's raft.
"Q. Was that part of his duty, looking after the raft? A. Yes, sir; logging. The company's boat was broken down that Sunday. I found out this between 8 and 9 o'clock Sunday morning. I did not see Shaw when he went and undertook to go in the company's gas boat, or when he went on the company's gas boat.
"Q. Mr. Dixon, there was a boat that the company had that was ordinarily furnished him for the purpose of making these trips? A. In what way do you mean?
"Q. The boat he was usually permitted to use in making these trips — the one you say was broken down? A. Yes, that was the National Handle Company's boat.
"Q. That was the boat he was permitted to use? A. Shaw never used any; it was used by Mr. Curby to haul logs.
"Q. The boat you say he undertook to use — it was out of shape that day? A. Yes. Shaw left in the boat of Mr. Elmer Jackson, of Plymouth. I saw Mr. Jackson about getting the boat. I went to Mr. Jackson; asked him was his boat in running condition. He said, `In perfect condition.' I asked him could we get it to go up the river for a raft — ours was broken down. By we I mean the National Handle Company. He said, `No, unless my crew goes.' Parker was his crew. *Page 224 
"Q. Did you agree for Parker to go? A. I didn't have anything to do with it. . . . I did not know where they were going — to what point on the river. I don't remember Norton telling me where he wanted the boat to go. He told me to tell Jackson that he wanted the boat to go until he met the raft. . . . Mr. Shaw did not have anything in the world to do with operating the gas boat. He did not have any duties to perform on the gas boat. He usually came from the log woods and went back on the Coast Line train. . . . Neither I nor anybody representing the company told him to go out with Curby on our boat. After our boat broke down, he went on Jackson's boat, just for convenience, on his own accord. He had no direction from the company to go, and no duties to perform. I do not know when he and Curby started out in the gas boat. They came to see me about 8 or 9 o'clock. I do not know whether Shaw came with Curby or not. Curby reported to me that the gas boat was broken down, and suggested that I would have to get another boat if he had to go up and get the raft. Then I went to see Mr. Norton, and he told me to see if I could get a boat. Then I went to see Mr. Elmer Jackson, to see if I could get his boat. When I told Jackson I wanted the boat, Jackson absolutely refused to hire the boat to me or the company, and told me that the only condition under which the boat could tow this raft was that he send it with his own crew, reserving absolute operation and control, at so much per hour. Jackson's boat was regularly engaged in towing logs, and had been for a long time — operated by Jackson with his own crew. I have never been on the boat and know nothing about gasoline engines. The only thing I heard about the boat, it was one of the best that run up the Roanoke River. . . . He (Shaw) could have gone on the train. I could not tell you whether it was his duty to be at the raft; however, he got there. I said he was going up for convenience, was all I know. I just said I could not tell about that. If Shaw had not gone, Curby was going by himself. I do not know whether it was, or was not, his duty to go after that raft. He was log foreman.
"Q. As log foreman he was supposed to look after the raft? Didn't you say that it was his duty to look after his raft? Didn't you call it Shaw's raft? A. I might have called it Shaw's logs; I think that was as far as he had to go — was to raft the logs.
"Q. Don't you know? A. That was his job, to get the logs and raft them.
"Q. Don't you know that it was not his business? A. Yes.
"Q. Why did you permit him to go? A. I didn't have anything to do with it. Mr. Curby was going. Mr. Curby was going after the raft. Shaw did not have any duty there, as far as I know. *Page 225 
"Q. Was it not his duty to see that the raft was equipped to come? A. To get the logs, haul them to the river, and then raft them. You did not understand me to say he could have met the raft on the Roanoke River on the Coast Line train. I ain't said it. . . . The only reason it was necessary at all for Shaw to go back to the woods was to get more logs. His duties with reference to the raft were complete. The only man to go after the raft was Curby, with a gas boat, to get it back. When the boat could not go, I contracted with Mr. Jackson to get his boat. The boat was going up the river. The raft was turned loose on Roanoke River to float down, and a colored man in a canoe would always go along with it until it was met by the boat. Shaw was going to the woods.
"Q. Is it not a fact that Shaw himself fixed up that raft, turned it aloose, and came back to Plymouth to get the boat to meet it? A. I do not know about that. I do not know. I had no information about it."
Elmer Jackson, witness for plaintiff, testified, in part:
"I am Elmer Jackson referred to in this testimony. I have owned this boat about sixteen years. I had a four-cycle twelve-horse power Globe engine. I bought it from Thomas R. Curby, Berkley, Va. Prior to buying it I had known it about thirty minutes. I have not the slightest idea how old it was when I bought it. It was not new. Both the boat and engine had been used before. I have used it ever since.
"Q. Have you owned it since the unfortunate accident? A. Yes, it is still running now every day. It has the same engine. I have replaced the valves about a dozen times. I have replaced the two exhaust valves since the accident, and the two intake valves I have had reseated. I remember no other changes since December, 1922, except that I have repaired the pipe. I have replaced the exhaust valves, had the intake valves reseated and replaced the exhaust pipe. Having made no other changes that I recall, except possibly some minor changes, such as tightening a bolt. Since Mr. Shaw's death I have used the boat pretty near every day. . . . Sunday was the day Mr. Dixon came to see me. I told him the only way I would send the boat was under the control and operation of my man — to tow the raft down for him. I would not permit him to take control, of the boat to go without my man on it. Mr. Norton had nothing to do with it. I did not see Mr. Norton. Parker was in control of the boat acting for me. I sent the boat with Parker off on my business. I had taken the contract. I had contracted with Dixon and was going for the National Handle Company's logs. . . . Since I have owned the boat I have repaired the windows. I have not enclosed it more. With the exception of the windows being broken, it was enclosed as it was at the time of the accident. I have had it enclosed six or seven years. I repaired the exhaust pipe *Page 226 
about three weeks prior to the time Mr. Leary came there, or may be a shorter time. I broke off the gas pipe, and that is why I repaired it. It was about three weeks prior to Mr. Leary's going there."
Mack Gregory, witness for plaintiff, testified in part:
"I live in Edenton. I am an automobile and gas engine mechanic. I have been engaged in repairing gas engines more than fifteen years. I know the construction of and am familiar with the operation of four-cycle engines. If the exhaust pipes are tight and mufflers tight and good joints, they don't give off any gases unless certain parts of the engine are worn. The exhaust pipe is on the other side of the engine. I saw the boat in controversy at Plymouth on Wednesday, 19 March, 1924, to the best of my recollection possibly a week before the 19th. . . . The engine did not appear to be new. It was a four-cycle Globe engine. That engine is not being manufactured; it is obsolete. This engine was built some twenty or twenty-five years ago. It was a gas boat that I would judge to be about thirty or thirty-five feet long; had a cabin-house built over it; engine inside; had glass windows around the front; door on the back. The life of an ordinary valve in a motor is, I should say, ten years. Possibly the valves were in there when the motor was built. I examined the valve stems and valves particularly. I would say that the valves in that engine had been running around ten years. I examined the engine thoroughly outside. I didn't take it down. I lifted the exhaust pipe up and examined it. It had been repaired."
The following questions were asked Mack Gregory and allowed by the court below, and exceptions taken:
"Q. I was asking you, Mr. Gregory, in your examination of this gas engine, tell us please what condition you observed about that engine? A. We found that the valves and valve guides were badly worn, and we found the exhaust pipe, between the engine and muffler, there is a flange union or connection where the two pipes are made together with the joints, which had become discolored from exhaust blowing. That was inside the boat. We found marks on this something like a tightening operation, if you would hammer it.
"Q. To what extent was the discoloration from the exhaust? A. Turned nearly black from escaping gas. The two sections of galvanized pipe, one about five inches long, another seven, and the sleeve union in between those two sections, and a new galvanized elbow.
"Q. What was that for? A. That takes the exhaust from the engine — from the muffler — outside of the boat. In other words, that is the exhaust pipe.
"Q. What other places did you observe through which the exhaust could leak? A. It could leak out of the worn valve. *Page 227 
"Q. Was there a crack on top of the cylinder head? A. It did not show anything. It was soldered or chinked. There was a small break.
"Q. About the discoloration? A. It was slightly black. The plate was not in the back; it was known as an open base engine and the original plate closed in by the engine was not there.
"Q. What effect, if any, would that have on exhaust leakage? A. If the cylinder and rings of that was worn, it would naturally blow gas fumes out of the engine into the cabin.
"Q. What do you mean by gas fumes? The fumes of exploded gas? A. Some of it would be exploded; some of it live gas.
"Q. Directing your attention to the things you observed, if those connections had been snugly made, would there have been leakage? A. No, sir.
"Q. If the valves, etc.? A. If the joints in the exhaust pipe and the pipe, good pipe, not rust-eaten or porous, it could not have leaked into the cabin — would have gone outside.
"Q. How about the plate? A. That would not have stopped the gas from going out. I did not observe the pistons. We had to take a screwdriver and lift the valves so that we could remove them around into the guides to see how much they were worn. . . .
"Q. I ask you, would there have been more than the average amount of leakage of gas fumes, from the conditions you observed? A. In my opinion, it would throw off far more gas fumes than an engine that is apparently new and tight. The valves were worn when I examined them in March. In my opinion the valves were worn a good deal more than an ordinary valve would have worn in that period of time — from December until the times I was there. In my opinion I found the wear on the valves more than would have been due to wear on the valves during that period of time. I said the valves appeared to be worn more than in the ordinary wear and tear since December, 1922, a year and three months. The extent to which they have been worn between December, 1922, and March, 1924, would necessarily depend upon the extent to which the boat was used. I do not know to what extent the boat was used. I could not know. I do not attempt to say when the valves were put there, but can say that they were badly worn."
Dr. F. H. Garriss, for plaintiff, testified in part:
"I am a graduate of Jefferson Medical College, Philadelphia, and have been a practicing physician since 1913. I am licensed by the State of North Carolina and practicing in Bertie County. I did not know the deceased Mr. Shaw, nor have sufficient acquaintance to know him when I saw him. I was coroner of Bertie County at the time of his death, and as such had occasion to examine his body. This was 19 December, 1922. When I first saw the body it was in a gasoline boat at *Page 228 
Quitsna Landing, on Roanoke River, on the Bertie side. The boat was closed by frame work, doors, windows and glass. Inside the enclosure was the wheel, the usual seats and the engine. There was only one deck, the bottom deck. It was on Wednesday, 19 December, that I went with the deputy sheriff of Bertie County, and saw the boat on the Bertie side. The boat had been entered before I went there; the door was opened. I found in the boat the corpses of two men, a white man and a colored man. The white man was identified by letters or other witnesses as Shaw. . . . When I found them the colored man was back of the engine. It appeared that he was sitting on a seat back of the engine. When he became unconscious he slipped down off of the seat and his head and shoulders off on the side with his coat rolled up under his shoulders. One foot was slipped by the engine and the other rested against the engine, preventing him from slipping entirely to the floor. It was John Parker. . . . The white man was in front of the boat between a high stool and the steering wheel; his pipe had fallen out of his mouth. His head, feet, hands and knees were all resting on the bottom of the boat. It was one of these stools that you sit on to steer the boat. He was dead. Both of the men were dead, and their bodies stiff. The weather was cold, and it had snowed the day before. Immediately preceding this it had been pretty cold. There was snow on the ground, and it was cold. . . . The engine was cold; we found the clutch in gauge with forward position. The oil cups were open and the switch was on. The boat was tied at a wharf at the time when I saw it. . . . I found a bottle in the boat, about a six and one-half ounce pop bottle. There were two or three drops of some liquid in it. I smelled the bottle, but could not swear what was in it. There were possibly five or six drops of liquid that you might see when you turned and bottle about. The bottle had a slight acid odor. There was no other bottle in the boat. There was no evidence of nausea or vomiting on the floor, and no other indications that any one had been sick.
"Q. Of course you conducted the investigation as coroner as to whether there had been any foul play? A. Yes.
"Q. What evidence did you find as to foul play? A. None whatever. There were no marks, except that Shaw's head was white from the pressure on the boat. I made the examination for that purpose. There were no marks on the other man's body. In the course of my preparation for the practice of medicine I had occasion to study chemistry, action of gases on the body — the human system. I have studied chemistry and have been practicing for thirteen years. Carbon monoxide is poison to the human system. It is a gas generated by incomplete combustion. Of course it is made commercially by the action of CO2 on *Page 229 
live coal. Imperfect combustion gives off carbon monoxide. Its effect is poisoning to the human system. The physiological effect is that it unites with the hemoglobin of the red cells in the blood, preventing the uniting of the oxygen with same. The hemoglobin of the red corpuscles, when carried to the lungs, absorbs oxygen _________ the heart, and carries it back to the tissues. It is impossible for a human being to live without oxygen. The hemoglobin is the oxygen carrier. Carbon monoxide combines with the hemoglobin shutting out the room necessary for the oxygen to combine with the hemoglobin. When the hemoglobin is combined with the carbon monoxide there is no room for it to combine with the oxygen. That effects poison. Carbon monoxide poisons the body in two ways, acutely and chronically. Acutely depends upon the saturation of the air. In some instances the amount of carbon monoxide in a garage gives a chronic monoxide, the explosion of any product — wood, coal."
The following questions were asked the witness, allowed by the court, and exceptions taken:
"Q. What effect, so far as increasing or decreasing the saturation of the air, would the turning of the discharge from the combustion into the apartment itself have? A. Physiologically? When carbon monoxide is eliminated, regardless of by gasoline engine, or gas plant, if eliminated into a closed room, if the saturation is as much as three per cent it will kill inside of ten or fifteen minutes. That is an acute poison. It is colorless, odorless, and tasteless gas. I know that from medicine as well as chemistry. There is no unusual odor from it nor necessarily any warning in the case of poisoning until the person is overcome. Of course, we are not considering pure carbon monoxide. Illuminating is made of carbon monoxide and other gases. The combination of carbon monoxide and other gases usually gives an odor.
"Q. From your examination of the boat, the condition in which you found them, and your observation of the condition when you came upon them, the condition of the boat as you observed it, and the other surrounding conditions, if you have an opinion satisfactory to yourself as to the cause of the death of the deceased, I would be glad if you will give it to us. A. In that case it was my opinion — of course my investigation was at that time only far enough to decide whether it was homicide. I didn't conduct the investigation far enough to decide what, but believe it came nearer being gas poisoning, monoxide gas poisoning, than anything else. The only other thing that could have caused death was the empty bottle. The size of the bottle, and not but one bottle, it could not have contained enough liquor or whiskey (if whiskey) to have produced death, and also if it had been liquor or other poison there would have been other signs present, as one person dying, or taken sick before *Page 230 
the other, the other trying to assist him. There were no other signs. The effect of alcoholic poison on the human system is nausea, vomiting, wrenching — they vomit, as a general thing. I do not know Mr. Norton personally."
On cross-examination the witness said in part:
"I can say that both of these men died at the same time — I mean both of them became unconscious at the same time, because both of them were in exactly the same position in which they became unconscious. I mean if two men were in one boat and one became unconscious the other would try to do something for him. This is a medical opinion and not an argument. . . . I gave them a careful examination. I stripped both of them on the boat and found no unusual marks on Shaw's body. . . . I did not make any blood test, nor go inside his lungs, stomach or heart. The real understandable cause of death by inhalation of carbon monoxide is asphyxiation. Asphyxiation means that when — it means he has been poisoned unto death by inhaling poison, which means that a man has been poisoned by inhaling a poisonous gas. It is this way, the carbon monoxide gas unites with the blood, preventing it from taking up oxygen, therefore the body dies from starvation of oxygen. That is all that I learned about it in my examination, since this autopsy. I treated a case of carbon monoxide poisoning in 1912 and in 1913, in Philadelphia and Norfolk. I do not remember the names of the patients. . . . The external post mortem symptoms are about the same, whether a man is hanged, drowned, or dies from inhaling gas. . . . In determining the question of death, we have to use all the evidence we can collect around the body and everything else. I am not drawing my conclusion entirely from the gasoline boat. I drew that inference in making the examination. I could not swear that they died from carbon monoxide; I do not swear to it now. If I told the jury you could not tell whether he died from carbon monoxide it was to the best of my opinion; you can have an opinion, but you cannot be positive. To my knowledge, I said at the coroner's inquest that they died from some common poison, from gas from an engine, or a combination of both. That was my opinion at the time. I did not know I had changed my opinion; I have not. I could not swear whether these men died from gas or from poison, or what they died from. I only have my opinion as to what it is. I would not say it was very inconclusive."
For the purpose of corroboration, a letter from Dr. Garriss to Mrs. W. D. Shaw was introduced, dated 20 December, 1922, which is as follows:
"Today held inquest over your husband.
"It appears that he was in a closed gas boat with a negro going up Roanoke River Monday morning. They were found Tuesday morning *Page 231 
with the boat stuck in the bank. They both appeared as though they died simultaneously. There was nothing to show that they were damaged or that there had been a fight of any kind. Mr. Shaw was lying where he fell off the stool where he was steering the boat, and the negro was lying partly on a bench back of the engine.
"We decided that as the boat was closed up tightly they were asphyxiated by escaping gas from the engine. Am writing you this because, according to the way he was sent home am afraid you would not get a true description of his death."
The usual issues of negligence, contributory negligence, and damages were submitted to the jury; found for the plaintiff and judgment rendered in accordance with verdict. Exceptions and assignments of error were duly made by defendants to certain evidence introduced by plaintiff during the trial. The defendants introduced no evidence, and, at the close of the evidence made a motion for judgment as of nonsuit, which was refused by the court below. Defendants excepted, assigned errors and appealed to the Supreme Court.
The first group of exceptions and assignments of error by defendants are to the court below permitting Dr. Garriss, plaintiff's witness, to answer the following questions:
"Q. What effect, so far as increasing or decreasing the saturation of the air, would the turning of the discharge from the combustion into the apartment itself have? A. When carbon monoxide is eliminated, regardless of by gasoline engine or gas plant, if eliminated into a closed room, if the saturation is as much as three per cent, it will kill inside of ten or fifteen minutes.
"Q. From your examination of the boat, the condition in which you found them, and your observation of the condition when you came upon them, the condition of the boat as you observed it, and the other surrounding conditions, if you have an opinion satisfactory to yourself as to the cause of the death of the deceased, I will be glad if you will give it to us. A. In that case it was my opinion — of course, my investigation was at the time only far enough to decide whether it was homicide. I didn't conduct the investigation far enough to decide that, but I believe it came nearer being gas poisoning, monoxide poisoning, than anything else. The only other thing that could have caused death was the empty bottle. The size of the bottle, and not but one bottle, it could not have contained enough liquor, or whiskey, if whiskey, to have produced death; and also if it had been liquor or other poison, there *Page 232 
would have been other signs present, as one person dying or taken sick before the other, the other trying to assist him. There were no other signs."
From the testimony, not denied, Dr. Garriss was a duly licensed and practicing physician of many years standing, and a graduate of a leading medical college. Whether or not a witness is an expert is a question for the court below to decide, and if there is any evidence that a witness is an expert, the decision of the court below will not be reviewed on appeal.
Defendants in their brief say: "There is no finding in the record that Dr. Garriss is an expert, but no point is made as to this."
Dr. Garriss saw the boat, the condition of the two men, how they were lying, the windows down, and, by personal observation, had knowledge of the entire situation. With this personal knowledge and observation of all the facts, and Dr. Garriss' training and experience as a physician, we think his evidence competent. Its probative force was for the jury.
In Flaherty v. Scranton Gas and Water Co., 30 Pa. Superior Court Rep., 446, it was said: "Two reputable physicians of long practice and high standing, each of whom saw and carefully examined the child, one at the beginning, the other near the fatal termination of its sickness, and each of whom was apprised of the conditions under which the sickness began, gave it as their deliberate opinion and judgment that the child died from the effects of an inhalation of gas. . . . That was an action against a gas company to recover damages for the death of an infant. It appeared that the employees of the defendant went into plaintiff's cellar to make some repairs in the gas service, and while so engaged permitted the escape of a volume of gas, which found its way into an upper room, where the infant inhaled it."
In that case, nor in the case at bar, was there an autopsy. The examination in each case was external and all the surrounding facts known to the physicians. They knew the facts, and on the known facts gave their opinion. Their education and training were for the purpose of enabling them to deal with and express their opinion as to what ills and the causes that constantly threaten and affect humanity.
In Davenport v. R. R., 148 N.C. p. 294, Hoke, J., says: "Even if it should be regarded as more strictly `opinion evidence,' when it comes from a source of this kind, from one who has had personal observation of the facts, and from practical training and experience is qualified to give an opinion which is likely to aid the jury to a correct conclusion, such evidence is coming to be more and more received in trials before the jury. McKelvey speaks of it with approval as `expert testimony on the facts.' McKelvey, p. 230." State v. Morgan, 95 N.C. 641; Jones *Page 233 v. Warehouse Co., 137 N.C. 337; Jones v. Warehouse Co., 138 N.C. 546;Lynch v. Mfg. Co., 167 N.C. 98; Ferebee v. R. R., 167 N.C. 290.
A recent interesting discussion of opinion evidence, by Stacy, J., is inS. v. Hightower, 187 N.C. p. 307. The entire Court concurred in this aspect of the case. It was there said: "Applying these principles to the instant case, we think the better practice would have been for Latham and Coursey to have stated the facts or to have detailed the data observed or discovered by them, before drawing their conclusions or giving their opinions in evidence, but we shall not hold it for legal or reversible error that such was not required as a condition precedent to the admission of their opinions in evidence before the jury. S. v. Felter, 25 Ia., 75; S.v. Foote, 58 S.C. 218. Speaking to a similar question, in Commission v.Johnson, 188 Mass. p. 385, Bradley, J., said: `By this form of examination no injustice is done; for whatever reasons, even to the smallest details, that an expert may have for his opinion can be brought out fully by cross-examination.'"
The evidence in Summerlin v. R. R., 133 N.C. p. 551, was excluded in the lower court, and sustained, "upon the ground that the witness was called upon to state a fact of which he had no personal or competent knowledge, and not merely the opinion of an expert. The opinion of the witness should be based upon facts admitted or found, or upon his personal knowledge, and not upon the assumption of the fact. The question should therefore be hypothetical, or rather supposititious, in form, following the precedents as settled by our decisions." Mule Co. v. R. R., 160 N.C. 252;Hill v. R. R., 186 N.C. p. 475.
It is well settled that "The testimony of an expert is not admissible upon matters of judgment within the knowledge and experience of ordinary jurymen." Greenleaf Evidence, sec. 440a; DeBerry v. R. R., 100 N.C. 315.
These assignments of error cannot be sustained.
The second group of exceptions and assignments of error by defendants are to the court below permitting Mack Gregory, plaintiff's witness, to answer the following questions:
"Q. I am asking you, Mr. Gregory, in your examination of that gas engine — tell us, please, what condition you observed about that engine. A. We found that the valves and valve-guides are badly worn, and we found the exhaust pipe between the engine and muffler — there is a flange union or connection where the two pipes are made together with the joints which had been discolored from exhaust blowing. That was inside the boat. We found marks on this, something like a tightening operation, if you would hammer it." (And like questions, all set forth in the material facts in the case.) *Page 234 
The witness Gregory testified, in effect, that he made an examination of this boat, on or about 19 March, 1924, in the presence of Mr. Leary, the plaintiff's attorney, the plaintiff himself, Elmer Jackson, who owned the boat, and others; that at this time he found both the two intake valves and the two exhaust valves much worn, and also found the exhaust pipe in a defective condition; and that by reason of the worn and defective condition of the exhaust valves and exhaust pipe, the boat, when in operation, would probably give off into the cabin fumes or exploded gas. He further testified that it would have been impossible for such fumes to enter the cabin from the intake valves, in any event, or from the exhaust valves or exhaust pipe, if they had been in proper condition, and that even in the worn and defective condition in which the exhaust valves and pipe were found, fumes could have been prevented from entering the cabin from these sources by the presence of a plate which he testified was absent. That is to say, according to this witness' testimony, that the danger from escaping gas arose solely from the worn and defective condition of the exhaust pipe and exhaust valves, and that had these been in reasonably safe condition all danger from such gas poisoning would have been eliminated.
This testimony was to the condition of the boat about fifteen months after the inquest of Dr. Garriss over the body of plaintiff's intestate. It is conceded that this testimony would have been competent if directed to the time of the deceased's death.
The defendants contend that the conditions were the same at these two widely separated periods is not to be assumed. The witness Gregory frankly states that he has no knowledge and cannot say what the condition of the exhaust pipe and valves were at the time of deceased's death; nor is there other testimony in the record tending to show a similarity of conditions in these appliances. On the other hand, testimony of Elmer Jackson, owner of the boat and witness for plaintiff, makes it clear that conditions were utterly dissimilar at these two periods. He testified that, since the accident and before Gregory's examination of the boat, he had reseated the intake valves — a matter of no importance, since Gregory testified that gas fumes could in no event have entered the cabin from the intake valves; also, that within the same limits of time he had wholly replaced the exhaust valves; and also that within the same period — about three weeks before Gregory's examination — the exhaust pipe had broken off and had been repaired or replaced. It thus conclusively appears that, with reference to the exhaust valves and exhaust pipe, from which alone Gregory testifies danger was to be apprehended, conditions had materially changed between the time of the accident and Gregory's examination, and that no inference as to *Page 235 
their condition at the time of deceased's death can be drawn from Gregory's testimony.
The plaintiff contends, on the other hand, the questions to which these exceptions were taken were all asked of plaintiff's witness, Mack Gregory, an experienced mechanic, who had made personal inspection of the gas boat in question. The court declined to permit the introduction of any of this testimony until after it had been made to appear from examination of the witness Elmer Jackson, owner of the boat, that the condition of the boat at the time of Gregory's examination was the same as at the time of the accident, with the few exceptions noted by the witness Jackson. After stating that he had owned the boat ever since the unfortunate accident under consideration, he said: "It was the same engine. I have replaced the valves about a dozen times. I have replaced the two exhaust valves since the accident, and the two intake valves I have had reseated. I remember no other changes since December, 1922, except that I have repaired the pipes. I have replaced the exhaust valves, had the intake valves reseated, and replaced the exhaust pipe; have made no other changes, that I recall, except possibly some minor changes, such as tightening a bolt."
With this evidence before the Court, we think the testimony of the witness Mack Gregory competent, even though the information was gathered some time after the accident complained of, and the following charge of the court below was correct: "There is one matter to which I should call your attention. Some evidence has been offered as to changes and repairs on the gasoline engine of the boat. This is submitted to you solely for the purpose of aiding you in ascertaining the condition of the engine in December, 1922, and must not be considered by you as in anywise tending to show the engine was defective by reason of any evidence that any additions or repairs were made to it after the death of the intestate. You will observe this caution in the consideration of evidence along this line."
In Blevins v. Cotton Mills, 150 N.C. p. 497, it was said: "On the admission of testimony as to the condition of the machine not long before the trial of the cause, and twenty-two months after the occurrence, the authorities are very generally to the effect that when the condition of an object at a given time is the fact in issue, its condition at a subsequent period may be received in evidence when the circumstances are such as to render it probable that no change has occurred. There are decisions which hold that after a long period the subsequent conditions should be rejected as a circumstance too remote (R. R. v. Eubanks, 48 Ark. 460), but this qualification of the principle does not obtain when there is direct evidence, as in this case, that no change in the meantime has occurred. Wigmore on Evidence, sec. 437; Thompson's *Page 236 
Commentary on Negligence, sec. 7870. It may be well to note that the doctrine we are now discussing refers to the objective conditions, where, from the facts and circumstances, it is reasonably probable that no change has occurred, and must not be confused with the position which obtains with us, that voluntary changes made by an employer after an injury to an employee, and imputed to the employer's negligence, are not, as a rule, relevant on the trial of an issue between them. Myers v. Lumber Co.,129 N.C. 252. This position involves facts and considerations of a different character, and in this State, as stated, has been subjected to a different ruling." Tise v. Thomasville, 151 N.C. p. 281; Boggs v. MiningCo., 162 N.C. p. 394; Person v. Clay Co., 162 N.C. p. 224; Morton v.Water Co., 168 N.C. p. 587; Balcum v. Johnson, 177 N.C. p. 213.
These exceptions cannot be sustained.
The third grouping of exceptions and assignments of error by defendant are "to the refusal of the court to allow defendants' motion for judgment as of nonsuit, made at the conclusion of plaintiff's testimony."
The main and most serious question in the case is, "Was there any
evidence to be submitted to the jury to support plaintiff's claim?" If there was, it was the duty of the court below to submit the evidence, and the weight of such evidence was for the jury to determine.
In Shell v. Roseman, 155 N.C. p. 94, it was said: "We are not inadvertent to the fact that the plaintiff made a statement, on cross-examination, as to a material matter, apparently in conflict with his evidence when examined in chief, but this affected his credibility only, and did not justify withdrawing his evidence from the jury. Ward v. Mfg.Co., 123 N.C. 252." Loggins v. Utilities Co., 181 N.C. p. 227.
The inference and conclusion from the evidence could be that Shaw went to look after the raft that he had put in the river to be floated down to Plymouth. He alone went with the negro engineer on Jackson's boat. For some reason, Curby did not go. The defendants made all arrangements for him to go. Surely the jury could infer he was about his master's business and in the scope of his employment and not there for his convenience. The court below left this aspect to the jury, and gave this charge: "But if you find that the plaintiff's intestate went on the boat on which he lost his life, and went on the boat without any arrangements with the defendants for him to do so, and was not at the time in the service of the defendants or in the performance of any duty for the defendants, and was traveling for his own convenience or pleasure, defendants would owe him no duty, except not to do him any wilful or wanton injury, of which there is no evidence in this case." *Page 237 
We think the charge fully meets the requirements of Gardner v. R. R.,186 N.C. p. 64, and like cases.
The inference and conclusion from the evidence could be that Shaw was asphyxiated. This was a question for the jury, from all the facts and circumstances surrounding the case. While nobody saw the plaintiff's intestate die, and there was no physical sign of the gas, from the position of Shaw and the colored man, their death in this cabin was under such circumstances that they died as a result of being asphyxiated by poisonous gas; that the boat was found with its nose in the bank of the river; that it must have remained there for some time. The coroner, Dr. Garriss, and others, went there, opened it up; there was a colored man in the act of slipping off the seat, showing some instantaneous means had caused his death — not by external violence. Shaw had dropped off the stool on which he was sitting to steer the boat, with his forehead touching the floor and his pipe on the floor. Both of them in this situation lead to the conclusion that they died practically simultaneously; that it would be unreasonable that one had died and the other had not attempted to aid him; therefore, that they died practically at the same time, without any external violence; that they were poisoned by gas; that there is no evidence of anything else, and that the condition of the engine would have generated gas. The physician, Dr. Garriss, the coroner, gave his opinion that, while he could not testify positively about the facts — he was not present — that in his opinion, according to his belief, from inspection, it was a case of poison by carbon monoxide, a product given off by incomplete combustion of gasoline from a gasoline engine. That the gasoline engine was open, oil cups turned, dry; that the coroner and jury made a careful examination of the cabin; they found only a pop bottle; that it did not have the odor of whiskey or any intoxicating liquor or poison, but had a slight acid odor, and that they could not have taken poison and died in such a sudden manner; that the positions of the dead men bear out the only reasonable hypothesis — that it was due to gas.
In Beal v. Coal Co., 186 N.C. 756, it was said: "It was the duty of the plaintiff to use ordinary care to furnish a reasonably safe place for plaintiff to work. This duty cannot be delegated, and if there is a breachof such duty, which is the proximate cause of injury to the employee, themaster is liable." (Italics ours.)
The principle is laid down in Gaither v. Clement, 183 N.C. p. 450, as follows: "That the duty of the employer to furnish his employee safe tools with which to perform his services, and a safe place to do so, depends upon the exercise by him of ordinary care in providing them, and an instruction that imposes upon the employer an absolute duty to furnish them, without qualification, leaving out the ordinary care required *Page 238 
of him in their selection, is reversible error." Owen v. Lumber Co.,185 N.C. p. 614; Murphy v. Lumber Co., 186 N.C. p. 747.
Labatt, in his work on Master and Servant, vol. 3 (2d Ed.), p. 2835, part of section 1073, says: "The broad ground relied upon is simply that, as between a servant and his employer, all appliances which he is authorized or directed to use ought in fairness to be placed upon the same footing as those which actually belong to the employer. In other words, the owner of the appliance, and his servants, are, for the purpose of determining the injured person's right of action, treated as being constructively the agents of that person's employer for the performance of a nondelegable duty incumbent on the latter. The mere fact that the employer, having no control over the appliance, is unable to remedy defective conditions, is in this point of view manifestly insufficient to absolve him, since he always has in his power to safeguard his servants by refraining from giving them orders which will put them in a position where their safety will be imperiled by those conditions. . . . In many, perhaps most, instances there is no real ground for contending that his want of control over an instrumentality constitutes a serious obstacle to his obtaining sufficient knowledge of its condition to enable him to see whether it will unduly endanger his servants or not, and there would therefore be no hardship or injustice in requiring him to make such investigations as may be necessary for that purpose. Even where an adequate examination by his own employees is practically impossible — as where the injury was caused by defects in the track of a railway not belonging to him — it seems not an unreasonable application of the doctrine of nondelegable duties to treat the servants of the owner as his agents. If he desires to protect himself from the consequences of the negligence of persons not in his service or under his supervision, it is easy for him to do so by making specific arrangements with their master for indemnification in the event of his being obliged to pay damages. To relegate the servant to his action against the party who owns the instrumentality must, in many cases, be productive of serious inconvenience, and will occasionally deprive him of all remedy." Leak v. R. R., 124 N.C. 457; Deligny v.Furniture Co., 170 N.C. 202.
In Ridge v. R. R., 167 N.C. 522, Walker, J., said: "It was the plain duty of the defendant to have made a reasonable inspection of this car, even though it was a foreign car or one belonging to another road. Any other rule would expose its employees to great hazards. We have held that the failure to properly inspect such a car is negligence, and if damage ensue therefrom, it is culpable or actionable negligence (Leak v. R. R.,124 N.C. 455); and the same principle was recognized and applied in B. O. R. R. v. Mackey, 157 U.S. 72. The inspection must *Page 239 
not only be made, but it must be done with due care. Leak v. R. R., supra;Sheedy v. C. M. St. Paul R. R., 55 Minn. 357." Cotton v. R. R.,149 N.C. p. 231.
On this phase of the case the court below charged the jury as follows: "It was the duty of defendants to exercise due care to furnish reasonably safe means and safe place for this purpose. And if you further find from the evidence, the greater weight, that the defendants failed in the performance of this duty and furnished a boat with a gasoline engine which was old, obsolete, worn and defective, so that by reasonable inspection and the exercise of the reasonable care it could have been ascertained that it was likely to cause injury by the emission of poisonous gases to persons using it in weather so cold as to require the windows to be closed, and you find as the proximate result of this failure of this duty poisonous gases, to wit, carbon monoxide, were generated and thrown off, causing the plaintiff's intestate injury and death, it would be your duty to answer this issue `Yes.' But unless you find these are the facts, if you are not so satisfied, you should answer it `No.' Unless you find by the greater weight of evidence that plaintiff's intestate's death was caused by poisonous gases thrown off, plaintiff's action being based upon the allegation that that was the cause of his death, and unless you find that defendant failed to exercise due care with respect to such engine, it would be your duty to answer the issue `No.'"
We think the court below charged the law applicable to the facts. The motion for judgment as of nonsuit was properly refused. The evidence was sufficient to be submitted to the jury. They passed on the facts, and we can find
No error.
ADAMS, J., dissenting.