## STATE v. MELVIN MESSER.

(Filed 9 June, 1926.)

**1. Homicide—Murder—Evidence—Witnesses—Physicians—Experts.**

Where the evidence is conflicting as to whether the defendant killed his wife on a dark night, in a storm, upon the mountains, with a blunt instrument, or whether the numerous wounds on her person and limbs taken collectively, were sufficient to cause death in the then physical or drunken condition of the deceased, and were caused by her slipping and falling upon a rock or other substance in the dark, relied upon by the defendant, it is competent on the defendant's appeal and under his exception for a physician, qualified as an expert, to testify as to whether the number of wounds under the circumstances could cause death, and whether a blunt instrument had been used in striking the deceased, under competent evidence as to the nature and character of the wounds found upon the body.

**2. Appeal and Error—Instructions—Contentions—Objections and Exceptions.**

Exceptions to the statement of the contention of the parties by the judge in his instructions to the jury, cannot be sustained when not promptly taken, or after the verdict.

**3. Same—Harmless Error.**

Upon the trial of a homicide, when a verdict of manslaughter has been rendered, a charge upon the law of murder in the second degree becomes immaterial.

**4. Appeal and Error—Instructions—Criminal Law.**

Instructions on a trial for homicide will not be held for error if taken in its related parts it correctly informs the jury of the law applicable to the evidence.

**5. Appeal and Error—Instructions—Evidence—Objections and Exceptions.**

The failure of the trial judge to recapitulate the evidence will not be held for reversible error in the absence of a request from the appellant that he do so.

APPEAL by defendant from *Oglesby, J.,* at February Term, 1926, of HAYWOOD.

The necessary facts and assignments of error will be considered in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Morgan & Ward and Alley & Alley for defendant.*

CLARKSON, J. On Cove Creek Mountain, in Haywood County, N. C., there lived, far up the mountain, a hard-working man, the defendant,

and his wife, Lillie Messer. They had been married over a third of a century and had born to them nine children, seven living. He was 54 years old and she about the same age. The evidence tended to show that they got along very well together. He was kind to her and provided well for her. On Sunday, 17 January, 1926, about midday, defendant went to visit his son, Albert, about one-fourth to one-half mile away. He and his wife had been drinking. She came over shortly afterwards. At nearly dark they started back home in a pouring rain. It was a dark and stormy night.

Reuben Rathbone testified: "When they started off about dark she was in a staggering condition, walking tottering like. I had observed that she had been drinking whiskey. It was plain that she had had too much. I believe Melvin Messer had been drinking, but he was not drunk—he was not anything like in the condition she was in. When they went away he was leading her by the arm." ·

The road leading from defendant's house to his son Albert's is a sled road; it goes around the mountain.

Mrs. Frank Jenkins testified in part: "I live right down under the mountain from Melvin Messer, something like a quarter of a mile as near as I can tell—we can almost see each other's house. I was at home on Sunday night, 17 January. I know where Albert Messer lives. I know the place as the Bill Avery Messer house. I heard some hollering along in the night about ten or eleven o'clock, as near as I could tell you, and it hollered some more. The night was stormy and raining awful, and it sounded like a woman or child screaming, the best I could understand; it sounded from where I could understand over between the Bill Avery place and the Albert Messer place, on the road leading from Albert Messer's to Melvin Messer's. . . . There were bruises on her face and hands and the front part of her legs on down. I asked him how she died, and he told me about them being caught out in that awful storm and about her falling on a rock, and how he tried to carry her; said he dropped her and fell with her one time in the rain and darkness over a bank—told me it was raining so hard and was so dark that he got out of the road and fell with her; she dead. He went home and hitched up the horse and loaded her on the sled and brought her home."

J. B. Leatherwood testified in part: "On the road between Albert's house and the forks of the road there were tracks and a fruit jar that was on the bank of the road with a good drink of liquor in it; then going on from there to the next place, something like one hundred yards, there was a little dip or hollow—the road curves around. Three or four feet a fence went below the road and crossed, and there had been a

sign below the road. There I found a string tied in a bow-knot, which looked to be a garter—I have it with me (shows string to jury). It had a bow-knot tied in it right on the edge, but the bow-knot slipped off, but that is the length of the string. Then you come on out about seventy-five yards further there was a cart-way that goes around about the house. The tracks came down and then crossed the trail and went out between the road and trail to a 'tizwood' bush, and there looked like limbs had been broken off the 'tizwood' bush. Something like twelve or fourteen feet from there there was prints of person's shoulders and head in ground and the print of a man's foot up above the shoulder. Me and Messer and J. Henry and John Walker went back and found a wisp of hair in the fence sixteen feet below the rock."

It was in evidence that L. M. Messer "found some hair along on the rock and around the rock, and then he found some on a chestnut bur nine feet back up the road. I saw him scratch some hair out of the dirt in the road. Defendant said it was his wife's hair."

J. H. Franklin testified in part: "I went along and saw where it looked like some one had been struggling—saw signs of a struggle—around the other side of the Bill Avery Messer house. . . . I found there on Tuesday a wisp of hair on the wire fence sixteen feet below this rock, something like nearly as large as your finger and about that long (measuring). . . . I saw the deceased. She was bruised about the face very bad, a cut on her forehead. I didn't look particularly close, but I seen it was very bad. I saw bruises on her hands and bruises from here on down to her ankles (indicates knees) on both legs."

M. L. Messer testified in part: "I had picked up parcels of hair about the rock and about the edge of the rock, and in looking about ten feet beyond the rock there was a bunch of hair on a chestnut bur—a right smart bunch of hair. I showed that to the defendant. He said it was hers. I have got that hair with me (exhibits same). I found that hair about ten feet beyond the rock on Tuesday—we found hair in the dirt below the rock."

Defendant weighed about 175 to 180 pounds; his wife weighed about 118 or 120.

Dr. S. L. Stringfield, an admitted expert, testified in part: "Lillie Messer had something like twelve or fourteen bruises and lacerations on her face, and on her chest and arms there were something like twenty-five or thirty; she had several skins and bruises on her hands and both knee-caps were badly bruised and skinned down to her shoes, and her feet had been badly hurt. I don't have any positive way of telling just how long these bruises had been inflicted before I saw them—probably the time they said she had been dead would be about my estimate; she didn't have any particular wound that you could classify as a mor-

tal wound.  It was more of the multiplicity of wounds than any par-
ticular one.  She had, as well as I remember, a cut over her eyebrow
and possibly down to the skull, but we were unable to find any fractured
bones; and other than these two, it was mostly lacerations and skins
and bruises over the body.  Q. What effect would you  say that the
number of bruises or wounds on her body would have on her?  A. In a
strong individual I would say from the examination that I made that I
would not think that these wounds were necessarily fatal, but nothing
else appearing and finding the patient dead, it would then possibly be
due to the wounds that had been inflicted, nothing else to account for
the death—she was below the average size; she looked to be a rather
frail, delicate woman.  Q. Doctor, these wounds you describe on her
body—state how would you think they were caused—what kind of an
instrument?  A. They were not caused by any sharp instrument, but
they were caused by some blunt instrument.  As I remember it, from
her knees on down all the way had a number of bruises and lacerations,
and what we call abrasions, which is nothing more than skins.  I think
there were about something like twelve on her face and twelve on her
chest; I don't know about under her arms, but they extended out on
both sides to some extent."

Dr. W. L. Kirkpatrick, an admitted expert, corroborated in substance
the evidence of Dr. Stringfield, and said: "Two of the bruises were what
we call lacerations or torn wounds with rough edges extending down to
the skull.  They were on the forehead above the eyes."  Without objec-
tion he stated: "In my opinion, she died from the effect of the bruises."

The defendant testified, in part: "We kept waiting until it would
slacken a bit; it commenced getting late and I wanted to get back home.
I was expecting the two little boys at home.  So we struck out, and
when we started she could not travel very good, and I had her by the
arm, and we kept on going towards home; we got along pretty slow.
Out along there is a little trail way that turns off down to what they
call the Bill Avery Messer house; there is where the trail turns off to
the left, and she kind of staggered against me and slid off, and I went
off with her; and I picked her up and tried to get back on the trail.  It
had rained and was so dark you could hardly tell how to travel except
by feeling of the road, but I knowed it well.  We went up the pathway
to the old house, through a field.  When she went over the bank I
straightened her up and went right on and it seemed she would keep
falling to her knees every once in a while.  I kept holding her by the
arm the best I could.  We went on down and crossed down by the
branch, just before we got out to where she finally fell.  I don't remem-
ber just how many times she fell, but I remember those times.  Just

before we got out in the road it was washed out right smart. It was a little bit steep, so I thought we would go around and get in the main road, and as we got down a little bit she made a blunder and fell loose from me and fell. I didn't see her hit nothing, but I picked her up as quick as I could and straightened her out, and she never did stand up any more or speak; that is the place where the rock is; it is what I call hard flint. It lies a little angular as the road goes this way. It is what you might say in the fork of the road. When I discovered she could not stand I was excited. I saw she was hurt, and I kept asking her, but she never did speak. I picked her up the best I could in the dark, and I could not carry her in my arms, and I thought maybe I could carry her on my shoulder. I shouldered her, and when I went to make one step on the bank I slipped and fell, and her on my shoulder. It was still raining, and was so dark you could not see your hand before you. I picked her up and fell with her, and just as quick as I could get her up I listened to see if she was breathing. She was not making any fuss. You could tell by holding her close. Then I picked her up again, and I shouldered her and slipped. I don't remember when I fell the last time, but I picked her up twice. After that I don't hardly think I could shoulder her any more. I just could not do it. I picked her up and moved her out of the main gully; the water was running along there. I hollered and called all I could. I was excited and in so much trouble that I could not make any statement of how long I did holler or stay there. I know that after I did come to myself and seen that she was plum gone, I just don't know how long I did stay there. . . . I had tried to carry her and couldn't do that, then I just decided I would take the mare and sled and get her to the house. The lamp went out and I felt around and got the mare and hooked her to the sled. I had an open lamp—no globe on it. I took the sled back close by where my wife's body lay. Didn't go plum down to where she was. It was a little steep. I laid her kind of angled on the sled. I don't know how many times I went back to see if she was getting off any. When I got home I laid her on the bed, staying there the balance of the night." Defendant testified he was not mad—had no malice. On cross-examination he said: "For the last two or three years I have been working and trying to make a living. I have not been making liquor. That old still up at my barn was an old thing some one left there to get some pieces out of. I don't know who brought it there. If there was any malt at my house I don't know it. My son, Albert, and I have not been making liquor for the last two or three years. I don't know point blank why Albert Messer is not here today. They have a little old revenue case against him and his wife."

STATE *v.* MESSER.

There was some evidence that defendant had a scratch or scar on his face. He claimed this was caused by a limb or twig striking him in the face. There was other evidence corroborating defendant.

The above is a partial narrative of the witnesses as to the tragedy.

There was no eye-witness to the killing. Sunday night, however, about ten or eleven o'clock some of the neighbors heard hollering, and the voice sounded like a woman or child screaming. This was in the direction of the point at which the defendant said his wife fell down and killed herself. There were signs of a struggle all about the place; some of the hair of the deceased was picked up at two or three places and a string used as a garter was also found. Near the place of the struggle was also found a "tizwood" bush which looked like limbs had been broken off it; tracks led up to this. It was a fair inference from the testimony of the State that the defendant became exasperated with his drunken wife on the way home that night, and using a limb from the "tizwood" bush, probably thrashed her at the time Jenkins heard a woman's voice screaming. They were both drinking. She was evidently dragged along the ground for some distance, which accounted to some extent for the abraded condition of her legs from the knees down and of her breast. The jury seems to have adopted the theory that the defendant had beaten his wife that night to such an extent as to cause her death. The physicians do not claim that any single wound caused her death, but the abundance of them, coupled with her physical condition.

Defendant's exceptions and assignments of error 1 and 2 were to questions put by the State's counsel to expert witness, Dr. Stringfield, as to the effect of such a number of bruises or wounds on her body, and second, as to what in his opinion was the kind of instrument used which made the wounds. This evidence was competent. *S. v. Harris,* 63 N. C., 1; *S. v. Stewart,* 156 N. C., 636; *Shaw v. Handle Co.,* 188 N. C., 232.

Defendant's exceptions and assignments of error 3, 4 and 5 were to statement by the court of the contentions of the State arising upon the evidence; they cannot in the condition of the record be assignable as error in this Court, particularly after the jury had convicted the defendant only of manslaughter. Further, no exceptions to the contentions were taken at the time. *S. v. Sinodis,* 189 N. C., p. 571.

The sixth exception and assignment of error cannot be sustained. It is a correct charge on the law of murder in the second degree, but whether it is or not is not material on this appeal, because the defendant was convicted only of manslaughter.

The seventh exception and assignment of error was to the portion of his Honor's charge applying the doctrine of manslaughter to some of

the particular contentions of the State in the case. The charge excepted to in this particular ·is abstractly correct. It should be interpreted, however, in connection with the other portion of the court's charge, which is as follows: "The·defendant further says that he is not guilty of the crime of manslaughter, and that you should so find. He argues that the State has failed to prove that the deceased came to her death from the result of a blunt instrument in his hands, and there is no presumption of malice or the unlawful act on his part resulting in her death; that there is no evidence of a combat; that the deceased never struck him and that the scar or scratch on his face was caused by a limb or twig striking him in the face. Gentlemen of the jury, the facts are for you. It becomes the duty of the court to instruct you of the principle of law applicable to the case. You take the law from the court and the court alone."

The eighth exception and assignment of error was to the alleged failure of his Honor to recapitulate the evidence. There is, however, in the record no request on the part of either the State or the defendant that the evidence should be recapitulated. In the absence of such request, there would be no error in a charge of this kind. *S. v. Ussery,* 118 N. C., 1177; *S. v. Kinsauls,* 126 N. C., 1095; *S. v. Shemwell,* 180 N. C., 718.

The defendant and his wife had been married over a third of a century; nine children had been born to the union. Along the lonely mountain trail he and she were on the way to their humble mountain cabin, where they had lived long years. Both had been drinking. It was raining torrents, the night was dark, the creek was roaring; sounds were heard above the rain, the storm and the roaring creek; they sounded like a woman or child screaming. There were signs of a struggle along the mountain trail. When the morning sun arose and the news scattered over the mountains and the neighbors came, they found her dead in her humble home. The little frail, delicate woman had twelve or fourteen bruises and lacerations on her face, on her chest and arms there were twenty-five or thirty. From the crown of her head to the soles of her feet she was covered with mud, wounds and bruises. Her hair was in a tangled web, some gone—two of the wounds on the forehead above the eyes were torn with rough edges extending down to the skull. Defendant said she fell on a rock in the road—where there is a flint rock—and killed herself, and died in about five minutes; that she fell four or five times. He tried to carry her home. He went home and hitched his horse to a sled and brought her to their home. The little cabin on Cove Creek Mountain is closed—the mother dead, the children scattered, the father in the toils of the law. A jury of his countrymen has convicted him of manslaughter. At the trial, his son,

WHITMAN v. YORK.

Albert, could not be with him to help bear the burden; he was a fugitive from justice—a liquor case against him. The old still is up in the barn near the cabin, a silent witness to a broken home, and scattered family.

We throw a mantle of charity around her. She performed her duty and went down into the valley of the shadow of death and bore him nine children.

"As the husband is, the wife is; thou art mated with a clown,
And the grossness of his nature will have weight to drag thee down."

The court below tried the case with care. We can find in law No error.