J. W. PUCKETT v. JIM DYER AND ORKIN EXTERMINATING COMPANY, A CORPORATION.

(Filed 14 December, 1932.)

**1. Trial D a—On motion of nonsuit all the evidence is to be considered in the light most favorable to plaintiff.**

Upon a motion to nonsuit all the evidence, whether offered by plaintiff or elicited from defendant's witnesses, is to be considered in the light most favorable to plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference therefrom. C. S., 567.

**2. Highways B n—Evidence of negligent driving and that such negligence proximately caused plaintiff's injuries held sufficient.**

Evidence that the individual defendant drove his car in a negligent manner in violation of statute and that such negligence proximately caused injury to the plaintiff *is held* sufficient to have been submitted to the jury, and the evidence of contributory negligence was properly submitted to the jury under instructions which were free from error. N. C. Code, 2621(45), (51), (54), (55), (7, a).

**3. Master and Servant D b—Evidence held to make out prima facie case that employee was acting within scope of employment.**

Evidence that the individual defendant was employed by the corporate defendant as a traveling salesman covering North and South Carolina, that the corporation furnished him a car and that it paid for the gas and oil used therein, including the gas and oil on the night of the plaintiff's injury, that the car at the time of the injury contained merchandise belonging to the corporate defendant and was being driven by the salesman as he was returning to his home late at night, together with other evidence for the plaintiff, *is held* sufficient to make out a prima facie case that the salesman was acting within the scope of his authority at the time of the injury, and the evidence, together with the corporate defendant's evidence to the contrary, was properly submitted to the jury under instructions which were free from error.

**4. Torts C b—Evidence that release was procured by fraud held sufficient to be submitted to the jury.**

Evidence that the plaintiff, while in a hospital where he had been taken following the injury in suit, had signed a release prepared by an agent of the defendant and witnessed by two agents of the hospital whose bill was paid by the defendant, that at the time of signing the release the plaintiff was in a weak condition and suffering from head injuries and had been unconscious for a long period of time and was not in his right mind, that he did not remember signing the release, that the consideration therefor was grossly inadequate and was left with the hospital and doled out to the plaintiff, and that the release recited that it covered all injuries from the accident, past, present and future, even including permanent injury and possible death, together with the fact that the agent procuring the release did not take the stand although present in court and having peculiar knowledge of the plaintiff's condition at the time of signing the

release, *is held* sufficient to show a peculiar relationship between the plaintiff and defendant's agents enabling them to take advantage of him, and is sufficient to be submitted to the jury upon the issue of whether the release was obtained by fraud.

5. **Same—Question of ratification of release by plaintiff held properly submitted to the jury under the evidence in this case.**

In order to constitute a valid ratification the party charged with ratification must act with knowledge of the material facts or have reasonable grounds for such knowledge, and where in a personal injury action the plaintiff contends that the release set up by the defendant was procured by fraud, and the defendant contends that the plaintiff ratified the release by accepting its benefits, evidence on the part of the plaintiff that his signature was procured when he was woefully incapacitated by parties in a peculiar position to take advantage of him, that he had no further dealing with the defendant relative to the release, that he did not remember signing it and that no copy of the release was left with him, and it appears that the release covered all injuries resulting from the accident, past, present and future, even to the extent of death, is held properly submitted to the jury under instructions which were free from error, and the jury's verdict on the issue in plaintiff's favor is upheld on appeal.

6. **Evidence K d—Form of hypothetical questions in this case held not prejudicial error.**

The form of the hypothetical questions propounded to an expert witness in this case are not held for reversible error under authority of *In re Peterson*, 136 N. C., 14.

APPEAL by defendant from *Cowper, Special Judge,* and a jury, at October Term, 1932, of MECKLENBURG. No error.

This is an action for actionable negligence brought by plaintiff against defendants, alleging damage. The defendant denied liability and set up the defense (1) "It is admitted that the defendant corporation furnished a car to the individual defendant to be used by him for the business of the defendant corporation and it is alleged by the defendants that the individual defendant, James Dyer, was not on business for the defendant corporation at the times complained of in the complaint"; (2) That the plaintiff was guilty of contributory negligence; (3) A release for $350.00 and payment of hospital and doctor's bill.

The plaintiff in reply contends: "The plaintiff was unconscious for 6 days; he had a severe injury to his head, causing concussion of the brain; that his leg was broken in two places, he was confined to the hospital for 4 weeks and was in such condition physically and mentally that he was unable to pass upon any important matter. That the defendants' doctor and agent calculated what his wages would amount to while he would be in the hospital and wrote it upon the plaster cast upon his leg. He suggested no amount; they told him what he owed

him and asked him to sign a paper they had. They did not read the release and if they had plaintiff did not have sufficient mind because of his injury to know the importance of it. Under said circumstances this plaintiff signed something. That the plaintiff further alleges that he was a sick man when he was approached by the defendants in the hospital; that he was under the care of a physician; he was confined to his bed; that he was unable to transact any business, his judgment was impaired by his weakened body and injury to his head, that his signature was procured by the fraud of the defendant's agent and took advantage of plaintiff's distress in the manner above stated. That they also well knew that plaintiff was only a watchman, he got small wage, he had a family to support, he was then disabled, could not earn anything, his family were in distress, he did not know the extent of his injury or the importance of his claim against the defendants, that the $350.00 in no way compensated him for his injury, it was an inconsequential sum compared with his injuries; that the defendants well knew this fact, for it was their doctor treating this plaintiff. That the defendants, by artifice, devices, schemes and plans of fraud procured this plaintiff's signature to said release."

The issues submitted to the jury and their answers thereto, were as follows:

"1. Did the plaintiff, at the time of signing the release, introduced in evidence as defendant's Exhibit No. 2, have sufficient mental capacity to understand the nature and legal effect of said release? Answer: No.

2. Did the plaintiff ratify the said release by accepting and retaining the consideration therefor after having knowledge of the nature and contents of said release? Answer: No.

3. Was the plaintiff injured by the negligence of the defendant, James Dyer, as alleged in the complaint? Answer: Yes.

4. If so, was the said James Dyer, at the time, acting within the scope of his employment with the defendant, Orkin Exterminator Company? Answer: Yes.

5. Did the plaintiff, by his own negligence, contribute to his injury as alleged in the answer? Answer: No.

6. What damages, if any, is the plaintiff entitled to recover? Answer: $4,150."

The court below rendered judgment on the verdict. The defendants made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones will be considered in the opinion.

*G. T. Carswell, Joe W. Ervin, Enos T. Edwards and Morgan Gilreath for plaintiff.*

*John M. Robinson and Hunter M. Jones for defendant.*

CLARKSON, J. At the close of plaintiff's evidence and at the close of all the evidence, the defendants made motions for judgment as in case of nonsuit. C. S., 567. The court below overruled these motions, and in this we can see no error. It is the well settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.

The evidence on the part of plaintiff was to the effect: That he was a night watchman at certain plants in Charlotte, N. C., and in going from one plant to another, on the early morning of 22 July, 1931, about 1:30 o'clock, walking east towards the city, 6 or 12 inches from the left-hand curb of Wilkinson Boulevard (West Morehead Street), a paved street, about 40 feet wide, he was struck from behind and the signs indicated he was dragged some 60 to 70 feet, about 5 or 6 feet from the left-hand curb, and when found was 2 or 3 feet off the Boulevard. He was picked up for dead and taken to and placed in the sanatorium where he remained some 27 days. He was unconscious from Wednesday until Saturday. Plaintiff testified in part: "I don't remember signing a release. I have a vague memory of something being said about a settlement and signing a paper and that is all. I was just conscious enough to know that some one was in there talking about signing a paper. It is just like a dream to me. I don't remember what was said. . . . I must have stayed in the hospital two or three weeks after the date of the release. Doctor treated me up until after I came home. . . . I do not remember anything having been said about how much the doctor's bill would be."

As to his injury, plaintiff testified, in part: "When I came to my senses enough to know, I was in so much pain and misery I prayed to die. I felt like I'd rather be dead than to suffer that way. The pain was all over me practically, in my left leg, right shoulder and head and I had some trouble with my side. I had a plaster cast on my leg. The cast was on my leg when I left the hospital and stayed there for some time after I left the hospital. I think I wore it four or five weeks after leaving the hospital. . . . I got around on crutches. I used the crutches about three months. After I left the hospital and went home, I had no money to amount to anything. . . . I worked for four or five months at the rate of three or four hours a day on up until the spring of the year." The night was damp, fog like, kind of cloudy. The

pavement was wet. Plaintiff when picked up was kind of drawn up "lying there still . . . he was not moving." Plaintiff's leg was broken in two places.

It was contended by plaintiff that defendant Dyer, at the time of the collision, was violating the following statutes:

N. C. Code, 1931 (Michie), section 2621(45) : "Any person who drives any vehicle upon a highway carelessly and heedlessly in wilful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving and upon conviction shall be punished as provided in section 2621(102)."

Section 2621(51) : "Upon all highways of sufficient width, except upon one-way streets, the driver of a vehicle shall drive the same upon the right half of the highway and shall drive a slow-moving vehicle as closely as possible to the right-hand edge or curb of such highway, unless it is impracticable to travel on such side of the highway and except when overtaking and passing another vehicle subject to the limitation applicable in overtaking and passing set forth in sections 2621(54) and 2621 (55)." Public Laws, 1927, chap. 148, sec. 9.

It was contended by plaintiff that the violation of these statutes was negligence *per se* and the proximate cause of plaintiff's injury.

This action was brought in the spring of 1932, 26 March. In 15 or 20 minutes after a car had struck plaintiff, Dyer was arrested by a detective of the city of Charlotte, at the home of his brother, and was prosecuted and pleaded guilty as a "hit-and-run driver."

N. C. Code, 1931 (Michie), section 2621(71) a; *S. v. Durham,* 201 N. C., 724. The evidence was plenary as to negligence on the part of defendant Dyer, which was properly submitted to the jury. In fact, defendants in their brief say: "It is conceded that there is abundant evidence upon the third issue as to the negligence of the said Dyer, and, as none of our exceptions relate to this issue, we will not further discuss the facts in reference thereto." The evidence, under proper instructions by the court below was submitted to the jury as to contributory negligence, who found for the plaintiff.

As to the liability of defendant Orkin Exterminating Company, "It is stipulated that the corporate defendant in July, 1931, was engaged in the business of exterminating rats, insects, and bugs. It is also stipulated that in July, 1931, Jim Dyer was an employee of the corporate defendant, was such an employee prior to that time, and has been such an employee since." A car, a Ford roadster, model 30, driven by Dyer belonged to the defendant company. It was driven by Dyer for the

company, over North and South Carolina, and the night of the injury
to plaintiff, the detective found a whole lot of stuff in the back end
of the car that was used for exterminating purposes by the defendant
company. Dyer testified, in part: "The company paid for all the gaso-
line that I used, all the time. They were paying for my gasoline on
this night that this injury took place. That was the terms of my
employment, they agreed to do that. They furnished me with a car and
furnished my oil and gasoline for the use of the car. When I gave them
a bill for expenses of gasoline and oil, I included gasoline and oil ex-
pended that night." On the night in question he said he was out riding
with a girl. Dyer was on his way home when plaintiff was struck. The
record discloses other evidence favorable to plaintiff's contentions on this
aspect. We think, under the facts and circumstances of this case, there
was sufficient evidence to make a prima facie case for plaintiff to be
submitted to the jury. *Jeffrey v. Mfg. Co.,* 197 N. C., 724; *Lazarus v.
Grocery Co.,* 201 N. C., 817.

The court below on this aspect charged the jury, to which there was
no exception, and in which we see no error: "The court charges you
that the rule known as 'scope of authority'—means that one is in the
scope of authority of his employer if he is acting in furtherance of his
master's business, or is doing something necessary to accomplish the
purpose of employment, or connected with some mission, or performance
of some service for the principal, in this case the employer. That is, he
is doing some work in and about his employer's business. If, gentlemen,
the purpose is purely personal then he is not, if the motive is to serve
the employer he is, and there has been no unreasonable deviation from
the employer's method of service, then he is acting in the scope of his
authority. The court lays down this, which is taken from our highest
Court as the criterion by which you are to be guided when you come to
consider that issue. (*Grier v. Grier,* 192 N. C., at p. 764; *Cotton v.
Transportation Co.,* 197 N. C., 709.) The court instructs you as to the
fourth issue: If the jury should find from the evidence and by its greater
weight, the burden being on the plaintiff, that Dyer was at the time of
the collision of the automobile with plaintiff acting within the scope
of his authority, under his employment with Orkin Exterminating Com-
pany, and in furtherance of the business of the codefendant, as I have
just defined and explained that to you, that if you find that from the
evidence, and by its greater weight, it will be your duty to answer the
fourth issue Yes."

As to the validity of the alleged release: The minister and pastor
of the plaintiff visited plaintiff while in the sanatorium. His testimony
was, in substance: "I visited the plaintiff three times while he was in

the hospital, first on Saturday after he was injured on Tuesday night. He did not have possession of his right mind; I visited him about eight or nine days after he entered the hospital. The day he signed the release, he thought he had gotten $1,000 in a settlement and he did not know what he was talking about. Visited him the third time just before he left the hospital and he did not have possession of his full mental faculties." There was abundant evidence by plaintiff and others to corroborate his minister and pastor.

The situation of plaintiff was peculiar—unconscious for a long period in the sanatorium. The physician fixing his charges, the agent of the hospital fixing its charges up to 15 August, 1931. The agent of defendant company preparing the alleged release, taking it to the hospital and getting it signed in the presence of two agents of the hospital, yet this agent of defendant company was present in court and he gave no evidence in the case. The contention made by plaintiff as to his mental condition when the alleged release was signed in the sanatorium, was peculiarly within the knowledge of defendant's agent, who procured the alleged release. He did not go on the stand, although in court, as the record discloses, to refute plaintiff's evidence. It may be that this was a silent admission of the contentions made by plaintiff, or at least, as in *Hudson v. Jordan,* 108 N. C., at p. 13, it was regarded as a "pregnant circumstance." *Walker v. Walker,* 201 N. C., at p. 184.

The small consideration was left with one of the agents of the sanatorium, who witnessed the alleged release, and was doled out to plaintiff. A copy of the alleged release, according to plaintiff, was not given him, as he was unconscious as to signing same. In the alleged release is the following: "It being further agreed and understood, that this release is intended to cover all claims, demands, damages, losses, or injuries which may be traced either directly or indirectly to the aforesaid injuries which appear now, *or do not appear at the present time, but which may appear at any time in the future, no matter how remotely they may be related to the aforesaid accident.* It being further agreed and understood, that this release is executed with the full knowledge and understanding on my part that there is likely to be, or may be, more serious consequences, damages, or injuries, as the result of the accident aforementioned than now appear *and that more serious and permanent injuries, even to the extent of death may result due to the injuries sustained in the accident aforementioned."* (Italics ours.) The agent of the defendant company was there with the alleged release when the agents of the sanatorium, who witnessed the alleged release, got there.

*Battle, J.,* in *Futrill v. Futrill,* 58 N. C., at p. 65, says this: "But it was held upon a great principle of public policy that, without any

proof of actual fraud, such conveyances, obtained by one, whose position gave him power and influence over the other, should not stand at all if entirely voluntary, or should stand only as a security for what was actually paid or advanced upon them, where there was a partial consideration."

*By analogy:* In *Abbitt v. Gregory,* 201 N. C., at p. 598, is the following: "The courts generally have declined to define the term 'fiduciary relation' and thereby exclude from this broad term any relation that may exist between two or more persons with respect to the rights of persons or property or either. In this, the courts have acted upon the same principle and for the same reason as that assigned for declining to define the term 'fraud.' The relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Butler v. Fertilizer Works,* 193 N. C., 632.

In *King v. R. R.,* 157 N. C., at p. 65-66, is the following: "The settled rule, which is applicable not only to awards, but to other transactions, is that mere inadequacy alone is not sufficient to set aside the award; but if the inadequacy be so gross and palpable as to shock the moral sense, it is sufficient evidence to be submitted to the jury on the issues relating to fraud and corruption or partiality and bias.' Where there is inadequacy of consideration, but it is not gross, it may be considered in connection with other evidence upon the issue of fraud, but will not, standing alone, justify setting aside a contract or other paper-writing on the ground of fraud.' . . . If the issue of fraud or undue influence is found in favor of the employer, and he has been injured by the negligence of the railroad, he may recover damages, without returning what he has received as benefits, but this will be allowed in reduction of the damages. *Hayes v. R. R.,* 143 N. C., 125." *Hill v. Ins. Co.,* 200 N. C., 502. The court below charged in regard to reduction of damages as to amount paid plaintiff.

In *Mangum v. Brown,* 200 N. C., at p. 299, it is said: "There was evidence that before the injury the plaintiff's mind had been normal; that at the time of the trial and previously he had become very much like a child; that he frequently acted and talked as a child; that his memory had failed; that his capacity to transact business had become impaired; that his mind did not seem to function. In these circumstances we cannot conclude as a matter of law that the matters involved in the second issue should have been withheld from the jury."

We think the combination of facts and circumstances in this case is such that the matter was rightly submitted to the jury.

At the close of all the evidence, and after overruling the motion for judgment as of nonsuit, the court, in its discretion, permitted defendants to make the following amendment to their answer: "Defendants allege that subsequent to the execution of the release, copy of which is attached to the answer, plaintiff fully ratified and approved said release by accepting and retaining the benefits of said release and thereby in all respects, recognized and approved the validity of said release and ratified the same."

The question of ratification is the most serious aspect of this case. After giving the contentions fairly on both sides of this question, the court below charged the jury as follows: "The court in reference to this issue desires to lay down certain principles of law in the language of our highest Court, and I charge it to you as the law: 'A release originally invalid or avoidable for any reasons, may be ratified and affirmed by the subsequent acts of the person interested. Thus, if one, while his reason is temporarily dethroned, executes a release, and after being restored to his proper faculties, knowingly takes the benefit of his contract, he thereby ratifies and gives it force and effect. There can be no ratification or affirmance unless the plaintiff knew or ought to have known, all the facts and circumstances attending the act to be ratified. Ratification presumes the existence of the knowledge of all of the facts, and one not informed of the whole transaction, is not in a position to ratify the same,' (*Sherrill v. Little,* 193 N. C., at p. 740). The court charges you that those principles of law are applicable to this case, in reference to the second issue, and applying the principles of law which the court had laid down. The court instructs you, that even if you should, from the evidence and under instructions of the court, answer the first issue No, yet if the defendant has satisfied you from the evidence and by its greater weight, the burden being upon the defendants, that after signing the alleged release in question, the plaintiff was restored to his proper faculties, that is, when he had sufficient mind to understand what he was doing, as I have already explained the meaning of that, that he knowingly took the benefits, made use of or entered into transactions, disposing of such funds arising out of the alleged settlement, and did so in accordance with the explanation which I have given you of ratification, then it will be your duty to answer the second issue Yes. The court further charges you on that issue, at the request of the defendants, which the court adopts as the law, 'Even though you should find from the evidence, that at the time the plaintiff signed the alleged release, which has been introduced as plaintiff's Exhibit No. 2, he did not have sufficient mental capacity to know what he was doing, yet if you should find from the evidence, and by its greater weight, that

at the time he took the money at the hospital, he knew that he had signed the alleged release, and knew that the money had been left at the hospital as a consideration of said release, and with this knowledge, accepted the money and retained it, this would be a ratification of the release by the plaintiff, and you should answer the second issue Yes. If the defendant has failed to satisfy you from the evidence, and by its greater weight, that the plaintiff did ratify the said release, as I have explained ratification, then it will be your duty to answer the second issue No."

In 12 R. C. L. (Fraud and Deceit), part sec. 157, p. 411-12, we find: "One may waive the right to sue for damages for fraud, by conduct inconsistent with an intention to do so. To constitute such a waiver in any case, however, the defrauded party must act with full knowledge of his rights, and of the material facts constituting the fraud. There can be no waiver where he did not know of the fraud, and had no means of discovering it. But knowledge of all the evidence tending to prove the fraud is not necessary. It is sufficient if the material facts which go to make it up are known. A failure sooner to discover the fraud may be excused by the existence of confidential relations between the parties, or by reason of the fact that he was misled by further false representations made by the other party."

There is no evidence on this record that plaintiff after the alleged release was signed, when he was woefully incapacitated, had any conversation directly or indirectly, or dealing of any kind in reference to this alleged release, with defendant Dyer or the agent of defendant corporation who procured same, in regard to the alleged settlement. A copy of the alleged release was not left with plaintiff at the time it was alleged he signed same, and his mental condition was such that he was unaware of what took place. Surrounded by those who had peculiar relationship with him, his mental condition and the other facts connected with the transaction, we think the evidence on this aspect was sufficient to be left to the jury. The alleged release says *"even to the extent of death."* In the language of the *Sherrill case, supra, "One not informed of the whole transaction is not in a position to ratify the same,"* and in R. C. L., *supra, "The defrauded party must act with full knowledge of his rights."* It was proper in the court below to have left the question of ratification to the jury.

The hypothetical questions propounded to the two doctors are similar to those approved *In re Peterson,* 136 N. C., 14, at least on this record it could not be held for prejudicial or reversible error. In the judgment below we find

No error.