GIDEON HINTON AND WIFE, MARY HARRIS HINTON, v. PAUL C. WEST AND SAUL WEST.

(Filed 28 January, 1935.)

1. **Mortgages F c—Transfer of equity to cestui que trust held to raise presumption of fraud under evidence indicating that trustee acted as agent of cestui que trust and was primary party to the purchase.**

   Plaintiff's evidence tended to show that he executed a deed of trust on his 48-acre tract of land to secure money borrowed, that the trustee and *cestui que trust* therein were brothers, that plaintiff, a colored man with impaired vision, did not know the difference between a mortgage and deed of trust, and carried on all transactions with the trustee without knowing the interest of the *cestui que trust*, that the trustee threatened foreclosure and advertised the land under the power of sale contained in the instrument, and that in order to prevent foreclosure, plaintiff, at the insistence of the trustee, executed a deed in fee to the *cestui que trust*, and that thereupon the trustee canceled the deed of trust of record, together with evidence of inadequacy of purchase price, and that the trustee had purchased notes secured by mortgages on contiguous tracts owned by third persons, and had attempted to purchase contiguous tracts of land *is held* sufficient to be submitted to the jury in plaintiff's action to cancel the conveyance of his equity to the *cestui que trust* on the ground of fraud,

the evidence indicating that the trustee was acting in the dual capacity of trustee and agent for the *cestui que trust*, and was the primary party in the purchase of the equity of redemption, which raises the presumption of fraud and places the burden of proving the transaction fair and free from oppression on defendants.

**2. Same: Estoppel C a—**

Evidence that plaintiff mortgagor ratified his conveyance of his equity of redemption to the *cestui que trust* and was thereby estopped to attack his deed for fraud *is held* for jury under proper issue and instructions.

CONNOR, J., dissents.

APPEAL by plaintiffs from *Moore, Special Judge,* at March-April Term, 1934, of WAKE. Reversed.

The testimony of plaintiff Gideon Hinton was to the effect: That he was a colored man, and inherited from his father some fifty-nine acres of land on the Leesville Road, about one and a quarter miles from Raleigh. The home he lives in is up on a hill two hundred to three hundred feet from the Leesville Road, with a view of the Country Club property, golf course, etc. His father owed for the land, and after his death Hinton finished paying for it. He has been living on the land fifty-one years. He has had cataracts on his eyes about six years and has lost a clear vision—he has only half vision. He could read and write a little, but not much. He sold off part of the land and had about 48 acres left. For the land he sold off, he received $75.00 an acre; $250.00 for a half acre; $125.00 for a half acre; $200.00 for two acres, and $200.00 for an acre. Parties who knew the land, in January, 1932, testified that it was located higher than the property adjacent and the reasonable worth was about $75.00 to $100.00 an acre and between $150.00 and $200.00 an acre, although there was no market for land then. Briggs & West is a law firm, practicing in the city of Raleigh. Hinton became acquainted with Briggs about the time of the World War. Briggs attended to some of his business. He met Paul West in the office and he drew a deed for him. Frequently West came on the property visiting, and at that time he did not own any of it, and Hinton owed him nothing. Paul C. West took out different things to Hinton—old clothes, a finger ring, and a 20-gallon soft-drink jar. He borrowed $300.00 and Briggs stood for him. A mortgage was executed to secure same on one-half acre with a two-room house on it. West sold him a Ford automobile owned by him for $475.00 and took a mortgage on the 48 acres of land, and he made a note for same, and West took up the Briggs debts and paid some taxes, etc. At the time he had never seen defendant Saul West. Paul C. West kept coming out to the place afterwards. West said: "If you are going to pay it, just put it all up."

The note and deed of trust to Paul C. West was made 15 November,

1930, and came due 15 November, 1931. It was for $1,020. He was dealing with Paul C. West, did not know the difference between a mortgage and a deed of trust. He was not dealing with Saul West, never knew he was getting money from him. When the note became due, Paul C. West came out to see him. After a while he told him he was going to foreclose, he could not carry it on. The Commercial Bank had been closed and caught him with his money tied up. He could not get the money "just laid off from him for awhile." Paul C. West made the matter known that he was going to make a foreclosure, provided he could not get the money. Later, unexpectedly, he came out and said the land was advertised for sale. The notice is dated 21 December, 1931. Sale date, Monday, 25 January, 1932. Signed, Paul C. West, Trustee; Briggs & West, Attorneys. It was advertised in the *Union Herald,* on 24 December, 1931, and on 31 December, 1931, and no more thereafter.

After frequent conferences during the period the land was advertised, Hinton, on account of the situation and provided the land was not foreclosed, made a deed for some forty-two acres to Saul West at the insistence of Paul C. West, leaving plaintiff Gideon Hinton some six acres. He delayed signing the deed, thinking there might be some hopes still to get the money or something to satisfy Paul C. West, who told him that he was not going out there any more. The time had very nearly expired, and perhaps the next day he would make a foreclosure, if the deed was not signed. Paul C. West had a paper with him and a lady from his office with him. After he could not borrow the money, he went up and signed the deed in Briggs & West's office. At the time West showed an advertisement, saying it was a clipping from where the land was being advertised, he said the time was nearly out. The deed was signed 20 January, 1932.

The deed of trust was marked "Satisfied" in the register of deeds' office on 21 January, 1932, "Paul C. West, Trustee." Four days before the advertisement expired for the sale of the land under the original advertisement, also on 21 January, 1932, there was a letter from Paul C. West confirming the sale, representing his brother, Saul West. Hinton had no lawyer representing him. A deed was made to him by Saul West for the six acres of land. He never saw Saul West on the land, but saw Paul C. West at different times. Paul C. West said he was going to build a house out there and do other things. He planted some fruit trees and made a vineyard. He built a barn and stables and had a fence built around it.

Paul C. West made certain propositions to get the six acres of land, which Hinton did not accept. On cross-examination: "No, I don't know Mr. Saul West, I never saw him. If I did, I didn't know him. I know Mr. Paul West. I have been knowing him as much as eight

years. I am near-sighted, Judge. Will you let me get down there a little closer? There he is right there. (Witness identified Paul C. West.) I have been knowing Mr. Willis Briggs ever since the World War was on hand. I will have to get a little closer to see Mr. Briggs. My eyes are in bad condition. . . . No, sir, I wasn't perfectly satisfied. I made the proposition because I had to do something, but I wasn't satisfied; I did not have what I felt like was justified. I accepted of the plan of six acres, but inside I wasn't satisfied. . . . I accepted of it, but I wasn't enjoying it so well. It is not so much what I wanted to do, but what I did. I wasn't so well qualified at it. That was what I did under some circumstances. I wasn't enjoying it so well. I knew what I was doing. . . . Yes, sir, he gave me a finger ring. I don't know what went with it. I didn't think it was very much. It was not a diamond ring. I don't think it was a diamond ring. It don't look like a diamond to me. It changed colors; it changed to a dim color. It shined when I got it, but it got dim-looking. He gave it to me. . . . What I received for the value of the place, I ain't been satisfied with, but I do not make much rumor about dissatisfaction in that way. I didn't make much rumor about it, but I wasn't satisfied. I hadn't said anything to him about it, but I wasn't satisfied about it, because I didn't think it was right. I have been all the while dissatisfied. . . . It was around the 15th, or somewhere in that neighborhood, about the 15th of January. Then he told me that it had been advertised in the newspaper and showed me the clipping of it. He told me that the property would have to be sold under the mortgage if I could not make some arrangements to take it up. . . . I think, if I can get a chance, I can get it. I think I can arrange for it. I have not arranged for it as yet. A stool pigeon—I would accept it as something of a deceiver."

J. P. Hill, a real estate dealer, testified in part: "I saw the property in January, 1932. I have been to see it to try to buy it, but he did not want to sell it. My opinion of the fair and reasonable market value of that property in January of 1932 is that it should be worth $150 an acre, between that and $200.00 an acre. I tried to buy it from Hinton. I went up there in the spring of 1932 to buy it. I did not know anything at all about this transaction between Messrs. West and Gideon Hinton at that time. I have no interest in this matter."

J. R. Dodge, a claim adjuster for the State Highway Commission, testified in part that Paul C. West, on 4 January, 1934, filed claim for damage for top soil taken off the Hinton place prior to July, 1933. He referred to the property as his. About 1 December, 1932, he made a request to build a short connection between the new road and the beginning of his farm road.

The testimony of Collins Foster, a colored man, was to the effect: That he had bought two acres of the Gideon Hinton tract about five years ago for $400.00. Paul C. West told him that he owned the Hinton property. Foster owed the Morris Plan Industrial Bank. West, without his request, purchased this note. When he heard about it, he went to see West. "I told him what I would take, $600.00, and he said that he couldn't pay that much for it; that he had just paid the mortgage that I owed the Morris Plan Bank of about $208.00, and he said he would pay that much, which was as much as he could pay. I hadn't had no agreement with him before that, not before he went up there to take up this note. Mr. West got a deed from me to my property. He paid me $20.00—$2.00 at one time and $18.00 another time."

The testimony of John Thompson, a colored man, was to the effect: That he owned twenty-six and a quarter (26¼) acres of land which joined Gideon Hinton's land. It was left by his father and mother to him. He lived there about 35 years. He owed some $400.00 mortgage to Mr. Montague. "Mr. West came out and said, 'John, do you want to sell your land?' I told him yes, but I couldn't sell it because it was mortgaged on down here to Mr. Montague's. He said, 'I'll come out again Tuesday and bring you some money.' He came out late Tuesday evening. A lady was with him. I don't know who she was. On Tuesday evening he said, 'John, I brought you $10.00.' I told him I couldn't take $10.00 for it. He said, 'If you don't take that, you'll take nothing.' I said, 'All right, I believe I'll take $10.00.' He wanted me to sign a paper. I made a cross-mark on it. I can't write. I can't read either. No, sir, I did not know what the paper was I signed. I didn't know whether it was a mortgage paper or not. Mr. West didn't tell me nothing. He just told me to sign the paper. I did not sign any paper for Mr. West except this one. That is all."

The testimony of Jenny Lipscombe, a colored woman, was to the effect: She bought one-half acre from Gideon, four or five years ago. She paid him $185.00 cash for it. Her husband got disabled to work and she moved there. "I know Mr. Paul West when I see him. The first time I saw him to know him he came up in my yard. He told me who he was. I think that was just before this past Christmas, if I make no mistake. He told me something about the Hinton land. He asked me if I wanted to sell that corner there, that half acre. I told him 'No, sir.' He said, 'Well, I have a note of yours and I would like to have this strip of yours to straighten mine out.' He said, 'I bought Gid Hinton's place up here and I am going to build and want to fill in this old road and want this half-acre to straighten out mine'—straighten out his land, I guess. I have never borrowed any money from Mr. West. He did have my note. It was for $175.00. He got it from Mr. Craw-

ley.  I did not ask him to buy my note—I didn't even know he had it.
The first time I knew he had bought my note was when Mr. Burke Lynn
told my husband about it.  The first time I actually knew he had it, he
come and told me he had it.  He made me a proposition.  He asked me
did that land belong to me.  I told him really no.  My cousin bought
the place, and I didn't decide to buy it, I told him, for I had not finished
paying for it.  He said, 'How much do you owe on it?'  I said, 'Around
$175.00.'  He said, 'I'll give you this note and pay this $75.00 and all
your back taxes.'  I finally got Mr. Moore to pay off my note and take
it in.  I did that because I wanted it.  I did not aim for Mr. West
to keep it if it could possibly be got away from him."

The testimony of Burke Hinton, a colored man, was to the effect:
"I have six acres of land out there and a house on it.  I bought the
land from Uncle Gid.  I think it was in 1926.  I know Mr. Paul West.
I have seen him out there on the Hinton property.  He went to see me
with respect to buying my land.  He said something to me about owning
the Gid Hinton property.  He told me that he owned the Hinton prop-
erty.  I can't remember all that he told me.  He said he owned the
Hinton property and wanted to get mine to straighten the line out.  He
did not tell me about any plans which he had out there that I remember.
The first time that I remember that he came to see me was when they
first began construction of the new road along by my house.  I believe
it was a year last fall.  Mr. West and I did not trade.  I did not want
to trade.  He made me an offer for it.  He offered me some other prop-
erty he had some place.  He came there more than once.  I don't re-
member how many times—to the best of my recollection two or three
times.  I don't remember what he offered me the second time.  I don't
know what place he offered me.  He offered me so many different places.
He would come there wanting to trade me.  He told me that he had the
John Thompson property—some time here last fall, just a little while
before Christmas.  He said he had a note on the Jennie Lipscombe
property.  I don't remember whether he said anything else about the
note or not.  He offered to trade me some place up in the country
beyond me—away up in the country somewhere."

A map offered in evidence by plaintiff, and on the lower right-hand
corner was the following: "Plat of Gideon Hinton property, owned by
Paul C. West, Wake County, North Carolina, January 27, 1932—Scale,
one inch to 200, C. M. Lamb, Civil Engineer."  On this map there are
shown several tracts of land fronting on the Leesville Road and the
tract embraced within three straight lines and the Leesville Road.  On
the north line there is the name "Lynn."  Beyond the west line is the
name "Thompson."  Below the south line is the name "Boone."  This
paper shows one large tract 42.4 acres and, in addition, shows a small

lot with the name thereon "Jennie Lipscombe"; a small lot with the name thereon "Will Harris"; a subdivision marked "Gideon Hinton," six acres; a subdivision marked "Burke Hinton"; and three small sub-divisions marked "Carolina Foster, Mary Lipscombe, and David Hinton, respectively." By the court: "The court finds as a fact that Mr. Lamb, the engineer who made the map sought to be introduced into evidence, is in the courtroom and was not sworn and offered as a witness in order to prove the map the plaintiffs desired to offer in evidence, and, there-fore, the court declines to permit the plaintiffs to introduce the map."

By Mr. Smith: "The plaintiffs wish to tender to the defendants a sum of money, in United States currency, which is in excess of the amount of the principal, interest, and taxes on the property, and now tender this to the defendants and request from the defendants a recon-veyance of the property to the plaintiffs. The sum of $1,300 is hereby tendered. The plaintiffs also move the court for an accounting between the plaintiffs and the defendant to the end that the correct amount may be tendered and paid to the defendants upon recovery upon this property in dispute from the defendants to the plaintiffs." By the court: "Let the record show that the defendants decline to accept the tender of money made by the plaintiffs to the defendants." Numerous witnesses testified to the general reputation of Gideon Hinton as being good.

At the close of plaintiffs' evidence, the defendants made a motion for judgment as in case of nonsuit, C. S., 567, which the court sustained, and gave judgment accordingly. The plaintiffs made numerous excep-tions and assignments of error, and appealed to the Supreme Court.

*Willis Smith, John H. Anderson, Jr., and W. C. Lassiter for plaintiffs.*
*J. C. Little, Douglass & Douglass, and Clem B. Holding for de-fendants.*

CLARKSON, J. Was the court below correct in sustaining the judg-ment of nonsuit? We think not. We do not pass on the truth or falsity of the evidence. Our province here is to determine if there is sufficient evidence to be submitted to the jury, more than a scintilla. The deed of trust from Hinton and his wife was made to Paul C. West, trustee, for his brother, Saul West. The plaintiffs' evidence indicates that he was dealing with Paul C. West in the negotiations for the loan and Paul C. West, trustee, for the sale; that Paul C. West was acting in a dual capacity as trustee and agent for Saul West, and was the primary party to the purchase. We think that there was sufficient evidence to be sub-mitted to a jury and a presumption arose from the evidence, if believed by them, which would require the defendants to show that the trans-action was fair and free from oppression.

In *Whitehead v. Hellen,* 76 N. C., 99 (100), *Pearson, C. J.,* said: "Courts of equity look with jealousy upon all dealings between trustees and their *cestuis que trustent;* and if this mortgagor had by deed released his equity of redemption, we should have required the plaintiff to take the burden of proof and satisfy us that the man, whom he had in his power, manacled and fettered by a mortgage and a peremptory power of sale, had, without undue influence and for fair consideration, executed a release of his right to redeem the land."   .   .   .   At page 101: "Courts endeavor to take hold of the substance and not the shadow, and will not allow the administration of justice to be evaded by forms, deeds, or 'men of straw.' By way of illustration, in our case, the plaintiff, feeling oppressed by the absurdity of a man's buying at his own sale, gets one Bernard to buy the land for him. He and May, the original mortgagee, convey to Bernard and he conveys to plaintiff. Bernard is 'a man of straw.'

"But the plaintiff says, 'I am no man of straw, I paid money for this mortgage debt, and bought the land at public sale.' 'True,' say the court, 'but did you thereby relieve yourself from the equity of redemption? "Once a mortgage, always a mortgage," is a trite maxim of courts of equity. By your purchase of the notes secured by the mortgage, you acquired all of the rights of May, and put yourself in his place—he could not have bought at his own sale—and it follows that you could not buy at a sale which was made by you, and of which you had the entire control.' "

*Ruffin, J.,* in *McLeod v. Bullard,* 84 N. C., 515 (531-2), quoting from *Whitehead case,* continues: "Bigelow, in his work on Fraud, page 160, says, there are certain relations, termed relations of confidence, from the existence of which the law raises a presumption of fraud, in any dealings that may take place between the parties, because of the undue advantage which the situation itself gives to one over the other. Of these 'relations of confidence,' he enumerates eight in number, and in the following order: Attorney and client; principal and agent; partners; trustees and *cestuis que trustent;* guardian and ward; executors and administrators; mortgagor and mortgagee; parent and child. Thus, he places the relation of mortgagor and mortgagee with the other well-defined and universally acknowledged fiduciary relations. Upon principle this should be so. It is due to good faith and common honesty that such a presumption should arise in every case where confidence is reposed, and the property and interest of one person are committed to another. To every such person, his trust should be a sacred charge—not to be regarded with a covetous eye." Rehearing, 86 N. C., 210; *Harrelson v. Cox, ante,* 651.

In *Abbitt v. Gregory*, 201 N. C., 577 (598), it is said: "The relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. 'It not only includes all legal relations, such as attorney and client, broker and principal, guardian and ward, partners, principal and agent, trustee and *cestui que trust*, but it extends to any possible case in which a fiduciary relation exists in fact and in which there is confidence reposed on one side, and resulting domination and influence on the other.' 25 C. J., 1119. In Pomeroy's Equity Jurisprudence, Vol. 2, sec. 956 (3d Ed.), it is said: 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.'" *Lee v. Pearce*, 68 N. C., 76 (79); *Puckett v. Dyer*, 203 N. C., 684 (690-1); *Bolich v. Ins. Co.*, 206 N. C., 144 (151-2); *Lockridge v. Smith*, 206 N. C., 174 (178-9).

We think the case of *Simpson v. Fry*, 194 N. C., 623, is distinguishable from the facts in the present case. In that case it is said, at page 627: "The grantee in the deed of trust is a trustee for both debtor and the creditor, with respect to the property conveyed. The creditor can exercise no power over his debtor, with respect to said property, because of its conveyance to the trustee, with power to sell, upon default of the debtor."

In the present case the evidence indicated that the trustee acted for himself or for the creditor, or acted together. He obtained a conveyance of the equity of redemption from the debtor. We think such power was exercised over the debtor that would require the defendants to show the transaction was fair and free from oppression. The capacity was dual. In the present case the evidence indicates inadequacy of consideration.

In *Leonard v. Power Co.*, 155 N. C., 10 (16), it is said: "Where there is inadequacy of consideration, but it is not gross, it may be considered in connection with other evidence upon the issue of fraud, but will not, standing alone, justify setting aside a contract or other paper-writing on the ground of fraud."

In *King v. R. R.*, 157 N. C., 44 (65), it is said: "When due weight is given to these matters, and there is evidence that the consideration is inadequate, it is a circumstance which, in connection with other circum-

stances, may be submitted to the jury, and if grossly inadequate, it alone is sufficient to carry the question of fraud or undue influence to the jury. Pom. Eq. Jur., Vol. 2, sec. 926-7." *Hill v. Ins. Co.,* 200 N. C., 502 (509-10).

The defendants contend that there was evidence of ratification. The evidence so indicates. This is a matter for the jury to determine under a proper issue and instruction. The "plat of Gideon Hinton property owned by Paul C. West," when properly proved, is some evidence.

From the view we take of the evidence, the judgment of the court below is

Reversed.

CONNOR, J., dissents.