JOHN BEN JACKSON, BY HIS NEXT FRIEND, GOEBEL PORTER, v. GEORGE F. SCHEIBER AND ROBERT PEARSON.

(Filed 26 February, 1936.)

1. **Automobiles D b—Evidence held sufficient to make out prima facie case that servant was acting in scope of employment at time of injury.**

    Evidence that a house servant was permitted to use the employer's car in doing errands for the employer, and that the employer often allowed the employee to drive the car to the employee's house for articles of clothing for himself, and that on the occasion in question the employer sent the employee to get a suit of clothing from a cleaning establishment for the employer and take same to the employer's apartment, that the employee, after getting the clothes from the cleaners, stopped at his house on the way to the employer's apartment in order to give instructions about his own clothes, that the house was about one thousand feet from the employer's apartment, and that the injury was inflicted as the employee was driving from his house to the employer's apartment, *is held* sufficient to make out a *prima facie* case that at the time of the injury the employee was acting within the scope of his employment, the deviation from the direct route being minor in its nature.

2. **Master and Servant D b—**

    Ordinarily, a master is not liable for a willful and intentional injury inflicted by the servant to vent his personal spite and hatred, although at the time the servant is on his master's business.

3. **Automobiles D b—Owner held not liable for injury inflicted by driver willfully and out of personal hatred and malice.**

    The competent evidence on the issue of defendant owner's liability tended to show that animosity existed between defendant's driver and the plaintiff, that the driver had threatened the plaintiff, and that at the time of the injury the driver backed his car past plaintiff, started the car forward, and deliberately struck plaintiff, while he was sitting several feet off the unobstructed road. *Held:* Defendant owner's motion to

nonsuit was properly allowed, since the evidence, even though sufficient to show that the driver was about his master's business at the time, showed that the driver stepped aside from the course of his employment and inflicted the injury willfully to carry out his threat, and that he was motivated by spite and hatred personal to himself.

**4. Evidence E b—Testimony of employee defendant in recorder's court held incompetent as to employer defendant in Superior Court.**

Plaintiff sued the driver of a car and his employer to recover for injuries inflicted by the driver. All of plaintiff's evidence tended to show that the driver willfully inflicted the injury out of spite and personal enmity. In the recorder's court the driver testified to the effect that the injury was accidental, and such testimony was introduced upon the trial in the Superior Court upon appeal. *Held:* The driver's testimony in the recorder's court was competent as against himself, but incompetent as against the employer, and is insufficient to raise a conflict in the evidence upon the employer's defense that the injury was inflicted by the driver willfully and out of personal hatred and malice, and the employer's motion to nonsuit was properly allowed.

APPEAL by plaintiff from *Cowper, Special Judge,* at 18 February, 1935, Special Civil Term. From MECKLENBURG. Affirmed.

This is an action for actionable negligence, brought by plaintiff against defendants, alleging damage. The defendants denied the material allegations of the complaint and set up the plea of contributory negligence. The evidence on the part of plaintiff was to the effect that John Ben Jackson, the plaintiff, was struck by a Chrysler automobile driven by defendant Robert Pearson, on South Alexander Street, between Hill and Vance streets, in the city of Charlotte, N. C., about 6:30 o'clock on 14 April, 1934. It was daylight. Pearson stopped the automobile in front of his house on the west side of South Alexander Street, the automobile entering from East Hill Street, and went into his house. Plaintiff was facing east, sitting on an oil can, about 2½ feet west of the drain.

Grady James, a witness for plaintiff, testified, in part: "After Robert Pearson backed up to East Hill Street he started forward. I did not pay any more attention to him until I heard a 'zoom.' I saw the car as it came down Hill Street. When it got four or five yards from Ben, it cut to its left straight towards Ben. I called to Ben and threw my hand out towards him. About that time the front bumper of the car caught Ben. After the car passed it threw up a cloud of dust. Pearson did not blow his horn as he came towards us. The next time I saw Ben he was in East Vance Street. He was lying on his face. Ben was about one block from where he was struck. I ran down there. When I got there Pearson was gone. . . . South Alexander Street at that place is dirt. It is about 18 feet wide. There was room for two cars to pass to the west of John Ben when he was sitting on the oil can."

Lloyd Thomas, a witness for plaintiff, testified in part: "Pearson's house is on the west side of the street. He (Pearson) came out of the house and backed north on Alexander Street. He backed up pretty speedy, about 15 or 20 miles per hour. He stopped at Hill Street. When Pearson backed north on Alexander Street, John Ben was on the east side of the street, sitting on an oil can. John Ben was sitting about two and one-half feet west of a little drain and about fifty feet south of where Pearson stopped the car in Hill Street. Robert Pearson started the car forward and drove south on South Alexander Street. He was going 20 or 25 miles per hour when he ran into John Ben, who was still sitting on the oil can. The right part of the front bumper hit John Ben and dragged him about one block."

Bradley Lee, a witness for plaintiff, testified in part: "I saw the car start off at full speed. It went straight until it got almost to John Ben. At that time it cut towards John Ben and hit him with the front bumper. If the car had gone straight, it would have missed John Ben about two and one-half feet. The car passed me with John Ben on the fender. I went down to where John Ben was lying. He had his face down in Vance Street, east of South Alexander Street."

John Ben Jackson, the plaintiff, testified in part: "My house is on the west side of South Alexander Street, and I crossed over to the east side and sat down on an oil can. That can was in the grass over between the drain and the fence. The fence is on the east side of the grass. The drain is on the west side of the grass. While I was sitting there I saw Robert Pearson. I saw him get in the car and back up the street. He got in the car down at his house, No. 816. That was south of where I was sitting. That was about as far as from where I am now to the second radiator in the courthouse. After Robert Pearson got in the car he backed up to the street. He was driving a Chrysler car. He backed clean up to Hill Street, passing by me. When he got to Hill Street the car stopped and started down on South Alexander Street again, the same street he was on when he was backing. I did not watch the car until it struck me. I was sitting with my back turned to Grady James and was talking back over my shoulder. I first whirled around with my face to him. I was not looking at the car when it struck me. I was talking to Grady James. Between the time Robert Pearson backed the Chrysler car by me until I was struck, I had not changed my position except to turn on the can. The can had not moved. I was sitting on the can both times. I do not remember being dropped from the automobile in Vance Street. The first thing I knew after the accident, my mother and brother was in the room with me in the Good Samaritan Hospital. It was Tuesday evening when I first woke up. I don't remember nothing between the Saturday I was struck and Tuesday. When I woke up I

was hurting all over. My face and head were hurting and both my wrists. I could not see. . . . (Cross-examination.) I was between the drain and the fence in the grass plot. I was not sitting in the traveled part of the highway. There was more than twenty feet between the drain and the curb on the west side and there was more than twenty feet between me and the curb on the west side. There was nothing in the street except this automobile. There were no other passing vehicles. I saw Pearson as he backed by me. . . . In order to hit me he had to get some part of his automobile over to the east of the drain out of the roadway, and at that time he had over twenty feet of clear roadway. . . . Pearson and I had had some difficulty before this. I had shot at him. I don't remember the exact date. It was in March and this happened in April. He is the only person I have shot at. I was in my back yard when I shot at him. I can't remember the date. I have said that the last time I had seen Pearson before I got hurt that he told me he was going to get me if it was the last thing he ever did. I don't know how long that was before he hit me. . . . (Question by plaintiff's counsel): You have testified about shooting the defendant Robert Pearson. Just explain why you shot at him. Plaintiff explained the quarrel. Recross-examination: Q. The question I asked you is, haven't you stated that Pearson ran into you on purpose? Ans.: Yes, sir. Q. And that's the statement you make now, isn't it? Ans.: Yes, sir. As to whether or not Pearson ever said anything to me about whether he ran into me on purpose or not, he did. He said where I could hear it that he intended to run over me and would do it again if he had the chance. I heard him say that one night when we was at a little party."

George F. Scheiber, the defendant, was examined by plaintiff, and testified in part: "On 14 April, 1934, in the afternoon, I instructed Pearson to go on an errand for me. I told him to go up town in my car and I told him to go to Wright's Cleaning place, which is on South Tryon Street, adjacent to the Catholic Church. He took my car and left with it on that trip. I told him to get a suit of clothes for me from Wright's Cleaners establishment and bring it back to the Addison Apartments. I didn't tell him exactly what streets to drive over or how to go. I just told him to make that trip for me. . . . When my car was brought home by Pearson immediately after the John Ben Jackson accident it had my suit in it and I got my suit. . . . As to whether I told him to go home at all, it would hardly be in my scope to tell him to go home at all. . . . I think he went in the car. When the reasons were justifiable, I allowed him to go to that community in the car." The witness further testified that heretofore when Pearson went out

with his car he allowed him to go to his house for articles of clothing, etc. It was in evidence that on the day in question he went to his home to tell his mother to have him a clean shirt for Sunday.

Edith Thomason, a reporter who took the testimony of Robert Pearson in the recorder's court, testified in part: "In that court he testified: Didn't you hit this boy and carry him down to the corner? Ans.: Yes, sir. I didn't know I hit him. Q. You knew this boy was sitting up there on this oil can? Ans.: I don't know what kind of a can he was sitting on. He was sitting six feet in the street." (To the foregoing and like questions the defendants objected. Objections sustained as to defendant Scheiber. Plaintiff excepted.) By the court: "The court understands that you do not introduce any of this evidence as it bears on the issue of negligence against Pearson?" By Mr. Gover: "Not against anybody, solely for the purpose of showing any bearing it may have on the question of whether this accident was intentionally inflicted."

The court below allowed the case to be submitted to the jury on the usual issues as to defendant Pearson. The jury rendered a verdict for plaintiff, and assessed the damages at $300.00. The defendant Scheiber introduced no evidence and the court below sustained a motion of nonsuit as to him. The plaintiff excepted, assigned error, and appealed to the Supreme Court. The plaintiff made numerous exceptions and assignments of error, and appealed to the Supreme Court.

*C. H. Gover, Wm. T. Covington, Jr., and Hugh L. Lobdell for plaintiff.*

*John M. Robinson and Hunter M. Jones for defendant Scheiber.*

CLARKSON, J. At the close of plaintiff's evidence the defendant Scheiber made a motion in the court below for judgment as in case of nonsuit. C. S., 567. The motion was allowed, and in this we can see no error.

The plaintiff, while sitting near the east side of South Alexander Street, was struck by an automobile which belonged to the defendant George F. Scheiber, and which was being driven by the defendant Robert Pearson. Pearson was employed by Scheiber as a house servant and had gone to a cleaning establishment to get a suit of clothes for his employer. At the time of the collision he was carrying the suit to the Addison Apartments, in accordance with Scheiber's instructions. On the return trip to the apartment house he stopped by his own house on South Alexander Street, which was approximately 1,000 feet from the Addison Apartments, to see his mother and have her to get him a clean shirt for Sunday. The plaintiff was struck after Pearson came out of his home, backed his car north along Alexander Street past the plaintiff, and then started forward south on Alexander Street.

We think on the entire record there was evidence that Robert Pearson, the defendant, was in the employment of his codefendant when the injury was inflicted on John Ben Jackson, the plaintiff. The deviation was of a minor nature, and the evidence was sufficient to make out a *prima facie* case to be submitted to a jury.

In *Duncan v. Overton,* 182 N. C., 80, we find that: The owner had put his son in charge of the automobile with instructions to drive himself and his baggage to college in Raleigh, and there to put the car in a garage for repairs. Instead of going to the garage, the son met other students at the depot in Raleigh and was driving them out to the college at the time the plaintiff was injured. At p. 82, *Clark, C. J.,* speaking for the Court, says: "The father having placed his son in charge of the machine to bring it from Nashville to A. & E. College at Raleigh, and then to the garage, is responsible for injuries accruing from the negligence of his agent while in charge of the machine on that errand, and is not released therefrom by an incidental divergence in discharging the duty entrusted to him before the driver reached the garage, such as is testified to in this case." *Lazarus v. Grocery Co.,* 201 N. C., 817; *Puckett v. Dyer,* 203 N. C., 684.

The matter has been recently discussed by *Schenck, J.,* in *Lertz v. Hughes Bros., Inc.,* 208 N. C., 490, and sustains the view here taken.

The general principle is thus stated in 2 Blashfield Cyclopedia of Automobile Law (1927, ch. 60, p. 1404): "The question whether a servant, in deviating from the direct route in performing work for the master, thereby departs from the scope of employment, will depend upon the degree of deviation and of the attending circumstances; and, if the deviation is slight and not unusual, it may be determined by the court as a matter of law that he is still engaged in his master's business, so as to render the latter liable for his negligence in driving, as, for instance, a variation of a couple of blocks in a city or congested traffic and varying conditions."

In fact, the able attorneys for defendant do not seriously controvert the law on this aspect, and in their brief contend that the question involved is as follows: "In an action against the owner of an automobile on account of injuries sustained through acts of owner's servant in driving the automobile when all the evidence of the plaintiff tends to show that the injury was intentionally inflicted, and there is no evidence tending to show the contrary, was it error to nonsuit the plaintiff as to the owner?" We think not, under the facts and circumstances of this case.

The plaintiff John Ben Jackson was a witness in his own behalf. He had shot Robert Pearson, the defendant, in a quarrel. He testified on cross-examination: "In order to hit me he had to get some part of his automobile over to the east of the drain, out of the roadway, and at

that time he had over twenty feet of clear roadway. . . . I have said that the last time I had seen Pearson before I got hurt that he told me he was going to get me if it was the last thing he ever did." (Recross-examination) : "The question I asked you is, haven't you stated that Pearson ran into you on purpose? Ans.: Yes, sir. Q. And that's the statement you make now, isn't it? Ans.: Yes, sir."

There was evidence that plaintiff was not in the street, and where he was sitting that Pearson had to go out of his traveled way to hit him. Where a servant commits a willful and intentional injury to vent his spite and hate, although while on his master's business, ordinarily the master is not liable.

In *Daniel v. Railroad,* 136 N. C., 517 (522-3), we find: "It is not intended to assert that a principal cannot be held responsible for the willful and malicious acts of the agent when done within the scope of his authority, but that he is not liable for such acts, unless previously expressly authorized or subsequently ratified, when they are done outside of the course of the agent's employment and beyond the scope of his authority, as when the agent steps aside from the duties assigned to him by the principal to gratify some personal animosity or to give vent to some private feeling of his own (*McManus v. Crickett,* 1 East., 106), and, as is forcibly stated by Lord Kenyon in the case cited, quoting in part from Lord Holt: 'No master is chargeable with the acts of his servant but when he acts in the execution of the authority given him. Now when a servant quits sight of the object for which he is employed, and without having in view his master's orders pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for his acts." *Southwell v. R. R.,* 189 N. C., 417 (419); *S. c.,* 191 N. C., 153, 275 U. S., 65, 72 Law Ed., 157.

It is said by *Hoke, J.,* in *Foot v. Railroad,* 142 N. C., 51 (53-4) : "The breach of duty can be and frequently is intentional and willful, and yet the act may be negligent; and it is only when there has been designed injury caused, or an intended damage done, that the idea of negligence is eliminated." *Roberts v. R. R.,* 143 N. C., 176; *Jones v. R. R.,* 150 N. C., 473; *Norman v. Porter,* 197 N. C., 222. Sherman & Redfield on Neg., secs. 3 and 4. Accordingly, we find the term "willful and wanton negligence" is coming to be not infrequently used both in the decisions and textbooks. 1 Thompson Com. on Neg., sec. 21; 2 Thompson, sec. 1626; *Railway v. Bryan,* 107 Ind., 51; *Express Co. v. Brown,* 67 Miss., 261.

The facts on this record disclose that Robert Pearson, when he inflicted the injury, stepped aside and did an individual wrong, to carry

out his threat, spite, and hate, and the purpose was personal to himself, and he alone is liable to plaintiff under the facts and circumstances of this case.

Pearson was not a witness in the trial below. What he said in the recorder's court was evidence against himself, but, as to defendant Scheiber, it was hearsay and incompetent, and properly excluded. The type of evidence excluded, and which plaintiff excepted and assigned error to, we do not think competent.

In *Wimberly v. R. R.,* 190 N. C., 447, it is said: "Animadverting on a similar situation in *Shell v. Roseman,* 155 N. C., 94, *Allen, J.,* said: 'We are not inadvertent to the fact that the plaintiff made a statement on cross-examination as to a material matter, apparently in conflict with his evidence when examined in chief, but this affected his credibility only, and did not justify withdrawing his evidence from the jury. *Ward v. Mfg. Co.,* 123 N. C., 252.'" *Shaw v. Handle Co.,* 188 N. C., 236; *In re Fuller,* 189 N. C., 512; *Southwell v. R. R.,* 191 N. C., 153, at p. 165.

We see no such conflict as set forth in the above cases on the entire record in this case that would require the case to be submitted to the jury.

For the reasons given, the judgment must be

Affirmed.